STATE of Missouri, Respondent,

v.

James Michael DAVIS, Appellant.

No. 63475.

Supreme Court of Missouri,
En Banc.

May 31, 1983.

James A. Blackwell, St. Charles, for appellant.

John Ashcroft, Atty. Gen., Priscilla Gunn, Asst. Atty. Gen., Jefferson City, for respondent.

WELLIVER, Judge.

■ Appellant was convicted by a jury of capital murder, § 559.005, RSMo Cum.Supp. 1975,[1] and was sentenced to life in prison without possibility of probation or parole for fifty years. At the time this case was submitted, this Court had exclusive appellate jurisdiction in cases in which a life sentence has been imposed. The 1982 amendment to Mo. Const. art. V, § 3 divested this Court of such jurisdiction, but we have determined that "in the interest of judicial economy" we will "retain those life imprisonment cases under submission to this Court on the effective date of the amendment." *State v. Martin,* 644 S.W.2d 359, 360 (Mo. banc 1983). We affirm.

I

At approximately 11:20 p.m. on October 24, 1977, St. Charles Police Officer Leslie Simpson was dispatched to the 905 Tavern in St. Charles to investigate a report that a man was flourishing a gun outside the tavern. As he approached the tavern he saw appellant run in front of the tavern, throw what appeared to be a long gun into a white 1959 Ford, and start to drive away. Simpson attempted to block the street, but appellant drove around Simpson's car and headed west on Morgan Street. As appellant eluded Simpson, Officer Gary Stroud, with whom Simpson had been talking when he was dispatched to the tavern, arrived and pursued appellant with the siren and red lights on his patrol car activated. Simpson checked to see whether anyone in

---

1. The capital murder statute is now codified at § 565.001, RSMo 1978.

the tavern was injured and then joined in the pursuit.

At the intersection of Morgan and Benton appellant lost control of his car and ran it onto some bushes. Stroud arrived as appellant was trying to free the car from the bushes and attempted to block appellant's escape. Appellant got out of his car and fired a shotgun blast into the windshield of Stroud's car. He fired two more shots in rapid succession and then returned to his car. Simpson arrived, having heard shots and seen Stroud's car come to an abrupt halt, and fired six shots toward the driver's side of appellant's car. Appellant managed to free his car, however, and he escaped south on Benton.

Simpson found Stroud slumped over the steering wheel of his car. Blood covered the chest area of Stroud's uniform and was on his left arm and face. Simpson immediately called for assistance, and within a few minutes an ambulance arrived and Stroud was taken to St. Joseph's Hospital. He later died. The autopsy showed that the shotgun blast ruptured or lacerated the aorta as it left the heart, causing fatal bleeding into the left chest cavity. Shotgun pellets also pierced the mid-right ventricle of Stroud's heart and his left lung.

Appellant crashed his car into a utility pole at the intersection of Benton and Jefferson, ten blocks away from the scene of the homicide. Officers Ernie Sutton and David Ramsey found him concealed in a flower bed beside a nearby house. His face and head were bloody, his face was swollen and bruised, and his breath smelled of alcohol. He mumbled something when the officers approached him. Sutton and Ramsey placed him under arrest, and shortly thereafter Simpson arrived. Appellant struggled with the officers and had to be restrained. He was taken to the hospital, where his injuries were treated. There he was read his *Miranda*[2] rights by Paul Orf, chief of detectives. Under questioning by Detective Orf, and in the presence of two other officers, appellant admitted shooting

Stroud with a 12 gauge automatic shotgun. Later at the police station, after again receiving the *Miranda* warning and signing a written waiver of his rights, appellant gave police the following signed statement: "I left 905 Tavern and went on Morgan. The red lights came on and I let him have it with a 12 gauge something. I don't remember what. I drove away and remember running into something, whatever it was. I didn't remember."

Appellant's sole defense was that he was not guilty by reason of mental disease or defect excluding responsibility. There was evidence that appellant had been a chronic alcoholic for upwards of twenty years and had been hospitalized for alcoholism on several occasions. He had been involved in several automobile accidents in which he suffered head injuries, and he was hospitalized several times as a result thereof. He suffered severe headaches, and he had at least one seizure for which he was hospitalized about one month. There was testimony that it was not uncommon for appellant to be unable to recall previous incidents. Appellant had also been under psychiatric care.

There was evidence that appellant had been taking several different prescription drugs, including Valium, Librium, Dilantin, and Antibuse. He also took Excedrin for his headaches. One witness testified that appellant had also been drinking on the night of the homicide. She said she telephoned him at the 905 Tavern at 11:05 p.m. that night and that appellant sounded "almost incoherent. He didn't make any sense at all. I couldn't make any sense out of what he was saying."

Medical testimony indicated that appellant's problem was neurologic rather than psychiatric. Experts testified that appellant suffered from a vascular malformation or scar tissue in his brain. It is unclear from the record whether appellant suffered from a mental disease or defect excluding

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

responsibility on October 24, 1977, the day of the shooting.[3]

The jury convicted appellant of capital murder. The state sought the death penal- ty, but the jury sentenced appellant to life in prison without possibility of probation or parole for fifty years. From that verdict appellant brings this appeal.

---

**3.** On direct examination Dr. Henry Bratkowski testified as follows:

Q. Now, you and Dr. Joseph Lerner had determined after the September 27th report that that should be modified to show this primary brain tumor, is that correct, Doctor?
A. That's correct.
Q. And that the original diagnosis in the opinion of both you and Dr. Lerner was in- correct and should be corrected to show this latter diagnosis, is that correct?
A. Yeah, that's correct; mainly Dr. Lerner. He's the neurologist.
Q. Did you and Dr. Lerner continue to con- cur in belief and opinion based upon your examinations and interviews with James Da- vis that *on October 24, 1977,* he was suffer- ing from a mental disease or defect which excluded criminal responsibility and which prohibited him from conforming his conduct to the requirements of law?
A. Yes, we certainly felt that way *at the time.*
Q. And as you sit here on the witness stand today, Doctor, do you still believe that diag- nosis to be correct?
A. Well, in light of the information which we received from the University of Missouri, I mean, they indicate that there's a lesion. Now, I don't—you know, the lesion is sup- posed—is allegedly—my opinion there, from the—the lesion has scar tissue and has ve- nous malformation. There is some, some- thing there that causing a problem for him. Now, whether or not—as far as I'm con- cerned there is a lesion. That's there, I mean, from my point of view.
 . . . .
Q. . . . Do you concur, Doctor Bratkowski, in the finding made by you and Dr. Joseph Lerner in the report of September 27, 1978, and the addendum of November 27, 1978?
A. Of course we believe *at the time*—
[PROSECUTOR]: I'm going to object to the question because he's not including what that was in the question. I think it's unclear to everyone including the jury what specifically he's asking the Doctor to agree to.
 THE COURT: Rephrase your question
 . . . .
 [DEFENSE ATTORNEY]: Yes, sir.
Q. . . . Doctor Bratkowski, in the psychiat- ric report signed by Dr. Joseph Lerner and co-signed by you dated September 27, 1978, you and Dr. Lerner found and made your findings that the accused does have a mental defect within the meaning of Section 552.010.
A. That's correct, yes, *at the time.*

(Emphasis added.) On cross examination by the prosecutor, however, Dr. Bratkowski testi- fied:

Q. . . . Doctor, would it be fair to say that concerning the condition of the Defendant on October 24th, 1977, you could not venture any opinion to what he was suffering at that time, is that correct?
A. At that particular time Doctor Lerner rendered an opinion. I didn't.
Q. Not on that date he didn't.
A. Well, he gave an opinion.
Q. You could not render any opinion—
A. I couldn't; no.
Q. —yourself?
A. I have no knowledge.
Q. You don't have any opinion if he was suffering from anything on that date.
A. He—well, he wasn't suffering from a psychosis as far as concerning—now, you talking about the actual incident itself?
Q. Right. *On that particular day you can- not say he was suffering?*
A. *No.*
Q. *No one can say that, can they not?*
A. *No.*
Q. *And Dr. Lerner did not say that, did he?*
A. *No.*
Q. *He was just giving his opinion at the time of that report, is that correct?*
A. *Correct.*
Q. *What kind of condition he felt the De- fendant had when he was doing it then?*
A. *Yes.*
Q. *He was not making that retroactive nine months before the time of the incident, was he?*
A. *No, I don't think so.*
Q. All right. And it's your opinion you can- not show any connection between any condi- tion the Defendant has now and what might have occurred back on October 24th, 1977?
A. No.
Q. You cannot show that something that he has resulted in him not knowing right from wrong or something like that?
A. No. It has to be a causal effect.
Q. A causal effect. You cannot say that?
A. No, cannot.

(Emphasis added.) On the surface the testimo- ny appears to conflict. In view of Dr. Bratkow- ski's testimony on cross examination, however, it is reasonable to infer that the qualification "at the time" that he placed on his statements on direct examination referred to the date of the mental examination and not the date of the homicide. That, of course, was a question for the jury.

## II

We first address appellant's contention that the evidence was insufficient to support the conviction for capital murder because "there was not one scintilla of evidence . . . proving deliberation and premeditation." The principles that guide our inquiry are well settled. Premeditation and deliberation may be inferred from the circumstances surrounding the homicide. *State v. Bolder,* 635 S.W.2d 673, 680 (Mo. banc 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 770, 74 L.Ed.2d 983 (1983); *State v. Strickland,* 609 S.W.2d 392, 394 (Mo. banc 1980). In assessing the sufficiency of the evidence, we must accept as true all evidence and inferences that tend to support the verdict and disregard all evidence and inferences to the contrary. We are limited to determining whether the evidence, viewed in the light most favorable to the state, is sufficient to support the verdict. *Bolder,* 635 S.W.2d at 679.

Premeditation is present whenever the defendant thinks about the act for any length of time, however short, before he commits it. *Id.* at 680. In this case appellant made the effort to get out of his car after Stroud arrived and then fire his shotgun into the windshield of Stroud's car. He fired not one shot but three, and he was close enough to Stroud's car that at least one of the spent shells landed on its hood. From these facts the jury could reasonably have found that appellant acted with premeditation.

The jury could also have found that appellant acted after deliberation. A deliberate act is a " 'free act of the will,' " *State v. Davis,* 400 S.W.2d 141, 146 (Mo.) (quoting *State v. McDaniel,* 94 Mo. 301, 307, 7 S.W. 634, 636 (1887)), *cert. denied,* 385 U.S. 872, 87 S.Ct. 142, 17 L.Ed.2d 99 (1966), that is done "in furtherance of a formed design to gratify a feeling of revenge or to accomplish some other unlawful purpose and while not under the influence of a violent passion suddenly aroused by some provocation," *State v. Anderson,* 384 S.W.2d 591, 608 (Mo. banc 1964). The evidence showed that on at least three occasions, once as close as two weeks before the incident, appellant exhibited disdain for the St. Charles police because of the traffic citations they had given him. He indicated that the police would "get theirs" and that he would kill the next policeman who stopped him. When appellant was arrested he told Simpson that "I should have blew your goddam head off, too," and he told Sutton and Ramsey that "[i]f I had my shotgun, I'd shoot you two som bitches [sic] too just like I did the other one." From these statements the jury could reasonably have found deliberation.

We are unpersuaded by appellant's argument that the killing was "committed on the spur of the moment while [appellant] was under the influence of a violent passion suddenly aroused" when the police gave chase. A finding of deliberation "depends not so much upon the time involved as upon an inference reasonably drawn from the evidence and circumstances surrounding the act." *Bolder,* 635 S.W.2d at 680. The lawful chase by police in the exercise of their assigned duties did not constitute provocation. *See State v. Smart,* 328 S.W.2d 569, 574 (Mo.1959). Given the jury's rejection of appellant's defense of not guilty by reason of mental disease or defect excluding responsibility, the intent to kill could be inferred from "the use of a deadly weapon on a vital part of the body of the victim," *Strickland,* 609 S.W.2d at 394, and "[w]ith evidence of provocation lacking, the . . . intent to kill provided deliberation," *State v. Sturdivan,* 497 S.W.2d 139, 142 (Mo.1973), *overruled on other grounds,* *State v. Anderson,* 515 S.W.2d 534, 542 (Mo. banc 1974).

We conclude that the evidence was sufficient to support the verdict.

## III

Appellant argues that the trial court exceeded its jurisdiction in forcing him to go to trial because he could not remember the events immediately surrounding the homicide and thus could not adequately assist his attorney in the preparation of his defense.

The trial court based its ruling that appellant was competent to stand trial upon the record of a previous competency hearing before another judge. Three witnesses testified at that hearing. Dr. Henry Bratkowski, the psychiatrist in charge of the maximum security unit at the Fulton State Hospital, and Dr. Joseph Lerner, a neurologist and psychiatrist and former consultant in forensic psychiatry at the Fulton State Hospital, testified on behalf of appellant. Dr. David Sherman, an associate professor of neurology at the University of Missouri-Columbia medical school, testified for the state.

Dr. Bratkowski testified that appellant's problem was neurologic, not psychiatric, and that appellant did not suffer from psychosis. He said that appellant for the most part remembered events before and after the homicide but had amnesia and could not recall the offense and the events immediately surrounding it. He admitted, however, that his diagnosis of amnesia was based solely on appellant's self-serving statement that he remembered nothing about the homicide.[4] He testified that appellant had the capacity to stand trial except on those occasions when appellant might become temporarily incapacitated because of headaches or seizures. At those times, he said, the proceedings should be stayed.

Dr. Lerner testified that tests run on appellant found evidence of non-psychotic brain damage that would affect appellant's memory function. He said appellant had told him that he remembered nothing between 11 p.m. the night of the homicide and 2:45 a.m. the next morning, when he was placed in a cell in the St. Charles County Jail. Dr. Lerner testified, however, that he believed appellant was fully competent to assist in his own defense. His report indicated that appellant understood the charges against him and was capable of participating in his own defense, and it recommended that appellant be returned to the court for disposition of the charges.

Dr. Sherman testified that, in his opinion, appellant did not have a brain tumor but instead had either scar tissue or a vascular malformation in his brain. He testified that there was no neurological reason why appellant could not go to trial and that appellant therefore was capable of standing trial.

█ We conclude from the foregoing that the trial court did not err by forcing appellant to go to trial. There was ample evidence in the record from which the court could reasonably have concluded that appellant was competent to stand trial. The fact that appellant might have suffered from amnesia affecting his recall of the homicide and the events immediately surrounding it does not change this result. "Amnesia is no bar to prosecution of an otherwise competent defendant." *State v. Gardner,* 534 S.W.2d 284, 289 (Mo.App.1976).

Appellant relies on *State ex rel. Sisco v. Buford,* 559 S.W.2d 747 (Mo. banc 1978), but that case is inapposite here. In that case relator, who was charged with the murder of his girl friend, had been found with much of the left side of his face and head blown away by a shotgun blast. The left frontal lobe of relator's brain, which controlled the emotional and memory functions, was gone. The Court held that on those facts relator could not be tried for murder, *id.* at 749, because

> as a consequence of the gunshot wound and the resulting loss of a portion of the brain, what has happened to relator is equivalent to a prefrontal lobotomy, an

4. Although it was not before the court at the competency hearing and thus cannot be considered in the resolution of appellant's contention here, we note that the evidence at trial indicates that appellant contradicted himself on a number of occasions. Medical reports introduced into evidence indicate that on one occasion appellant said he remembered hitting a utility pole and hearing glass break. On another occasion, however, appellant said he did not remember the same events. At one point he said he did not recall having a weapon in his car. At another point, though, he told Dr. Lerner that "[he] did have a shotgun that [he] used for hunting ducks," and in the written statement he gave police he said he shot Stroud with a "12 gauge something."

operation utilized to attempt to decriminalize a person with a violent personality. If successful, such an operation creates a neuter personality. Such person can dress and feed himself and do some handiwork. He could know, as relator did, that he was charged with killing his girl friend. However, ... *a prefrontal lobotomy type condition disturbs initiative and in almost all instances causes a marked loss of a person's "critical faculty," or, in other words, disturbs their ability to correctly evaluate their behavior or the adequacy of their action.* As a result, ... relator cannot in an orderly fashion help counsel in the preparation of his defense.... *[T]here are definite deficits in his ability to plan ahead, to look at the information he has and to deal with that information in a coherent manner. [One expert] could not say that relator could make decisions, place events in proper sequence or make analyses and deductions....*

As a result of his present condition, relator has amnesia and cannot remember any of the events in connection with what occurred relating to the death of [his girl friend]. Hence, he cannot testify effectively as to what occurred. *In addition, he cannot analyze and evaluate or make decisions. This condition would prevent his assistance to counsel in deciding upon pleas or strategy* as well as causing him to be of no assistance in investigation or locating other witnesses. This inability is not feigned. It is the result of the loss of a portion of his brain which is essential to such functioning on his part.

*Id.* at 748 (emphasis added). Consequently, the Court said, *Sisco* was "not merely a case of amnesia as to the period in question." *Id.* This fact, we believe, makes *Sisco* wholly distinguishable from the present case.

### IV

Appellant next contends that the trial court erred in refusing to declare a mistrial

when the prosecuting attorney violated the trial court's order by asking on voir dire more than the two specific questions that appellant says the court approved, at a conference prior to voir dire, for qualifying the panel for the death penalty.[5]

Appellant's argument fails for two reasons. First, the restrictions of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), apply "to the answers elicited from veniremen rather than the questions asked on voir dire." *Bolder,* 635 S.W.2d at 686. Second, appellant was not sentenced to death, and the restrictions of *Witherspoon* do not apply to cases in which the death penalty has not been imposed. *Bumper v. North Carolina,* 391 U.S. 543, 545, 88 S.Ct. 1788, 1790, 20 L.Ed.2d 797 (1968); *State v. Baskerville,* 616 S.W.2d 839, 845 (Mo.1981); *State v. Borden,* 605 S.W.2d 88, 92 (Mo. banc 1980). Appellant argues that a "death qualified jury ... is inevitably prosecution prone and thus partial to the state," but he offers no empirical data to support that claim. We rejected a similar unsubstantiated claim in *Bolder.* There we said that "[s]ince *Witherspoon* several scholars have conducted empirical studies in an attempt to prove or disprove [this] hypothesis. As we recently noted, however, '[t]he studies ... are not conclusive.'" *Bolder,* 635 S.W.2d at 686 (quoting *State v. Mercer,* 618 S.W.2d 1, 7–8 (Mo. banc), *cert. denied,* 454 U.S. 933, 102 S.Ct. 432, 70 L.Ed.2d 240 (1981)). In the absence of convincing data that a death qualified jury is conviction prone, there is no constitutional infirmity in allowing a defendant to be tried by such a jury. *Bumper,* 391 U.S. at 545, 88 S.Ct. at 1790; *Witherspoon,* 391 U.S. at 516–18, 88 S.Ct. at 1774–75.

### V

Appellant argues that the trial court erred by admitting into evidence, over his objection, a photograph of Stroud in full

---

**5.** Nothing in the record indicates the extent to which the trial court limited the prosecuting attorney's questions concerning the views of the veniremen regarding the death penalty. That fact, however, is immaterial to our resolution of this issue.

uniform that was taken before Stroud was killed. He contends that because the photograph "was not a pictorial exhibit of the body of Officer Stroud showing the wounds sustained," it was "offered and introduced strictly and solely to inflame and prejudice the jury" against him.

 A photograph is admissible in a criminal case if it "corroborates the testimony of a witness, connects the accused with the offense, provides the identity of a victim, or tends to prove any material elements in the case." *State v. Daugherty,* 631 S.W.2d 637, 641 (Mo.1982). The trial court has broad discretion whether to admit such a photograph, and its decision will not be declared erroneous absent abuse of that discretion. *Id.; State v. Weekley,* 621 S.W.2d 256, 260 (Mo.1981); *State v. Burnfin,* 606 S.W.2d 629, 630 (Mo.1980).

 The court of appeals rejected a virtually identical claim regarding a photograph of a manslaughter victim in *State v. Teter,* 633 S.W.2d 417, 420 (Mo.App.1982). Like the court in *Teter,* we cannot say that the trial court in this case abused its discretion. The photograph was used to identify Stroud as the victim. If the photograph satisfies the test for admissibility, the fact that it might tend to agitate the jury is not a sufficient cause to reject it. *State v. Thresher,* 350 S.W.2d 1, 7 (Mo.1961). Undoubtedly the photograph would have had a greater tendency to inflame the jury had it been "a pictorial exhibit of the body of Officer Stroud showing the wounds sustained." The trial court did not err by admitting the photograph into evidence.

## VI

Appellant complains of two remarks the prosecuting attorney made during trial regarding the defense of not guilty by reason of mental disease or defect excluding responsibility.

## A

During recross examination the prosecuting attorney requested Dr. Bratkowski's opinion whether at the time of trial appellant suffered from any type of mental disorder, disease, or defect. Appellant's attorney objected on relevancy grounds, arguing that the relevant issue was whether appellant suffered from a mental disease or defect excluding responsibility at the time of the homicide. At that point the trial judge summoned counsel to the bench, and the following occurred:

THE COURT: I guess it's—there's an instruction that I'll give which says if he no longer suffers from a mental disease or defect that he can be released. Isn't that what one of the instructions say [sic] and wouldn't that make it relevant?

[DEFENSE ATTORNEY]: But that, that would be still in my opinion completely irrelevant to any issue in this case. We're not trying to determine what his condition is today.

THE COURT: In paragraph 2.372 "The defendant could be released from such confinement only if and when it was determined that he did not then have and in the reasonable future was not likely to have a mental disease or defect."

[DEFENSE ATTORNEY]: Right. The fact is you have to write in the word "judicially determined," because it certainly isn't medically determined.

THE COURT: Well, that's covered in the third paragraph "The defendant could be released after psychiatric determination only upon order of this court after notice, et cetera." You say that his present mental condition is not in issue?

[DEFENSE ATTORNEY]: No, it's not an issue now since I've been compelled to go to trial....

[PROSECUTOR]: *Well, if he doesn't have a disease, then he can't go there.*

[DEFENSE ATTORNEY]: Well, certainly he would go there until—

[PROSECUTOR]: *Not if he doesn't have a disease. There would be no reason.*

(Emphasis added.) Appellant's attorney objected at that point to the italicized statements and requested the court to declare a mistrial. He argued that the prosecuting attorney made the statements "so the jury

can hear," that the statements were "directed directly toward" the jury, and that the jury therefore would "ignore that instruction [regarding commitment of a defendant adjudged not guilty by reason of mental disease or defect] because they have now heard orally that he will not be committed." The trial court overruled the motion for a mistrial but sustained the original objection regarding the prosecuting attorney's question about appellant's mental condition at the time of trial. Appellant now contends that the trial court erred by refusing to grant a mistrial.

The declaration of a mistrial is a drastic remedy that should be employed only in those extraordinary circumstances in which prejudice to the defendant can be removed no other way. *State v. O'Neal,* 618 S.W.2d 31, 35 (Mo.1981); *State v. Jones,* 594 S.W.2d 932, 937 (Mo.1980); *Kansas City v. LaRose,* 524 S.W.2d 112, 120 (Mo. banc 1975). Whether a mistrial should be declared rests largely within the discretion of the trial court, *State v. Purnell,* 621 S.W.2d 277, 283 (Mo.1981); *O'Neal,* 618 S.W.2d at 35, because the trial court observes the incident that precipitates the request for a mistrial and is in a better position than is the appellate court to determine what prejudicial effect, if any, the incident has on the jury, *id.; State v. Reynolds,* 608 S.W.2d 422, 427 (Mo.1980); *LaRose,* 524 S.W.2d at 120. The trial court's decision whether to grant a mistrial will not be disturbed in the absence of an abuse of discretion. *See O'Neal,* 618 S.W.2d at 35.

In this case we cannot say that the trial court abused its discretion in refusing to grant appellant's request for a mistrial. The judge observed that the jury was located some fifteen or twenty feet away from the bench and declared his belief that the jury did not hear the prosecutor's remarks. That is a determination that we cannot make on the basis of the cold record before us. We find no error.

### B

During the rebuttal portion of the prosecuting attorney's closing argument the following occurred:

[PROSECUTOR]: ... This defense of mental disease is generally only—you see it in two cases; one when the charge is very serious such as Capital Murder, and the other time it's used is when there's no other defense. And that's exactly—

[DEFENSE ATTORNEY]: Now, Your Honor, I'm going to object to this line of questioning—statement. It's highly improper and there's no evidence to support it.

THE COURT: Overruled.

[PROSECUTOR]: That's the only time it's used. You should find this Defendant guilty because this mental disease defense doesn't work. First, there's no mental disease, and second, secondly, there's no connection between any alleged mental disease [and] the acts that night ....

Appellant argues that the trial court erred in overruling his objection because the prosecutor's argument regarding use of the insanity defense was "disparaging" to that defense and "literally eliminated [it] from the consideration of the jury."

"The trial court is afforded wide discretion in determining the permissible scope of counsel's argument to the jury and unless an abuse of discretion is demonstrated, to the prejudice of the accused, the case will not be reversed on appeal." *State v. Wood,* 596 S.W.2d 394, 403 (Mo. banc), *cert. denied,* 449 U.S. 876, 101 S.Ct. 221, 66 L.Ed.2d 98 (1980). We hesitate to say that this argument is permissible as a matter of law. There may well be situations in which it could constitute error, and for this reason we believe it should be avoided. On the specific facts of this case, however, we do not think the trial court abused its discretion. It was clear to the jury that this case exemplified both instances in which the prosecuting attorney said the insanity defense is used. The charge was indeed serious. The jury knew that appellant was charged with capital murder and that the state in all likelihood would seek the death penalty. The jury also knew that appellant asserted no other defense, for appellant's

attorney had admitted in his closing argument just minutes earlier that "the State yesterday and today presented 23 witnesses and approximately 60 exhibits, 11 of those witnesses being either present or past police officers to prove something that the Defendant conceded the State's evidence would show yesterday morning."

Appellant relies upon *State v. Camlen,* 515 S.W.2d 574 (Mo. banc 1974), *State v. Nickens,* 403 S.W.2d 582 (Mo. banc 1966), and *State v. Curby,* 553 S.W.2d 566 (Mo. App.1977). Those cases are not on point. As we recently noted, *Camlen* and *Nickens* "are distinguishable because they involved prejudicial appeals to the juries' fears and apprehensions that a successful mental defect or disease defense would result in the release of the accused and the commission of future antisocial acts." *State v. Mensah,* 625 S.W.2d 135, 137 (Mo.1981). As in *Mensah,* "[n]o such suggestion was made in the instant case." *Id. Curby* is distinguishable because there defendant relied upon the defense of justifiable assault and the prosecutor, in an objection, commented that the defense had earlier indicated its intent to rely upon an alibi defense.

## VII

Finally, appellant makes two arguments regarding alleged misconduct by the trial judge.

### A

Appellant argues that the trial judge exhibited "utter disdain" for the testimony of his witnesses because he "repeatedly turned his back to [appellant's] witnesses and to the jury and conversed with the court clerk or bailiff." In contrast, he claims, the judge "exhibited intense interest" in the testimony of Dr. Sherman, who testified as the state's rebuttal witness, and at the end

---

**6.** The transcript reveals that at the conclusion of Dr. Sherman's testimony the following occurred:

THE COURT: Doctor, you may step down. *Step up here for a second.*
(AT THIS TIME THERE WAS AN OFF–THE–RECORD DISCUSSION BETWEEN *COURT AND COUNSEL* ...)

of Dr. Sherman's testimony "summoned Dr. Sherman to the bench where comments were exchanged and both the trial judge and Dr. Sherman laughed." He also claims that the judge "ordered [his] attorney to sit down when said attorney attempted to view an exhibit the prosecuting attorney was then utilizing."

We agree with appellant that the trial court "must maintain a position of absolute impartiality, avoid any conduct which might be construed as indicating a belief on the part of the judge as to the guilt of the defendant and the court should not demonstrate hostility toward the defendant." *State v. Mitchell,* 622 S.W.2d 791, 798 (Mo.App.1981). We will not hesitate to take corrective action whenever there is evidence of abuse. On the record before us, however, we reject appellant's allegations. "The standard for determining if the trial court has acted improperly is whether the trial court's conduct is such as to prejudice the minds of the jury against defendant thereby depriving defendant of a fair and impartial trial." *Id.* It is unclear from the transcript whether the judge did indeed summon Dr. Sherman to the bench.[6] In any event, nothing in the record other than the affidavit of appellant's attorney himself supports the contention that the trial judge and Dr. Sherman laughed within the jury's view. Even if the judge did summon Dr. Sherman to the bench, we think that in this case that act alone did not have the prejudicial effect that appellant ascribes to it. Particularly is this true when, as here, there was no objection by appellant. Finally, appellant's other allegations are supported only by the affidavit of appellant's attorney, and at least in the absence of an objection on the record we do not believe that constitutes a sufficient basis for a claim of bias on the part of the

(Emphasis added.) Given the fact that the judge spoke directly to Dr. Sherman and then immediately thereafter conferred with the attorneys at the bench, the judge's direction to "[s]tep up here for a second" is equivocal.

trial judge. We find no error, plain or otherwise. *See State v. Selman,* 433 S.W.2d 572, 577 (Mo.1968).

### B

Appellant also argues that the trial court committed plain error by refusing to permit his attorney to argue his alternative motion to set aside the verdict, to enter a judgment of acquittal, to enter a judgment of not guilty by reason of mental disease or defect excluding responsibility, or to grant a new trial.

 Our review for plain error is limited to determining whether there was error affecting "substantial rights" that resulted in "manifest injustice" or a "miscarriage of justice." Rule 29.12(b). Here there was no plain error. This case was tried in St. Charles before a special judge assigned from Cape Girardeau. Appellant's attorney said that he attempted to contact the judge six times during September 1981 in order to schedule a timely hearing on the motions but that the judge refused to go to St. Charles to hear his argument. The judge explained that during that period his father died and the other circuit judge in his circuit was hospitalized. We think trial courts should, as a matter of policy, afford criminal defendants an opportunity to argue their after trial motions whenever feasible. Nothing in Rule 29.11, however, requires them to do so. In this case the judge adequately explained why no hearing was held on the motions. Furthermore, appellant preserved for appeal, and we have considered, all of the substantial arguments he raised in his alternative motions. The remaining arguments made in the motions have not been pressed on appeal and thus have been abandoned. *State v. Raspberry,* 452 S.W.2d 169, 174 (Mo.1970). We find that no manifest injustice or miscarriage of justice resulted from the absence of a hearing on the motions.

The judgment is affirmed.

RENDLEN, C.J., HIGGINS and DONNELLY, JJ., and HENLEY, FINCH and SEILER, Senior Judges, concur.

GUNN, J., not sitting.

BILLINGS and BLACKMAR, JJ., not members of the Court when cause was submitted.