**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Earl JONES, Defendant-Appellant.**

No. 50848.

Missouri Court of Appeals,
Eastern District,
Division Two.

July 22, 1986.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Aug. 27, 1986.
Application to Transfer Denied
Oct. 14, 1986.

Henry Robertson, Asst. Public Defender, St. Louis, for defendant-appellant.

John M. Morris, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

REINHARD, Judge.

Defendant was convicted by a jury of robbery in the second degree, § 569.030, RSMo 1978, and was sentenced to five years' imprisonment. He appeals. We affirm.

Defendant was convicted of the November 22, 1984, mid-morning robbery of Keith Robert Merrill. The victim testified he went to a bar in Illinois about 5:30 a.m. the day of the robbery. At the bar he consumed four eight-ounce cups of beer and cashed a paycheck. At approximately 8:00 to 8:30 a.m. he went to a second Illinois bar where he had something to eat and drank only water. He then drove to St. Louis, exited from Interstate Highway 70 at Broadway, and was driving north on Broadway when he was flagged down by a woman holding a child. The woman was about 4 feet 10 inches tall; the child was a girl, about eight years of age.

The victim offered them a ride and was directed to an alley some four or five blocks away. As the victim stopped his car in the alley, the woman grabbed his car keys, turned off the engine, pulled the keys from the ignition switch, and tried to get out of the car. The victim grabbed her hair and, as he attempted to wrest the keys from her grasp, the key chain broke and the keys fell to the floor of the car. At this time the victim saw three men running up the alley toward him. The men began striking the victim and pulling him from the car while the woman was pushing him out. As he was pulled and pushed from the car, the victim landed on one of his attackers whom he identified in court as the defendant. During the struggle, the defendant removed the victim's wallet from his pocket while the woman opened the car's glove compartment and removed money and personal papers. Then the three men and the woman ran from the car into a residence at 8917 Newby, entering by the side door.

The victim chased his assailants a short distance and then returned to his car. He started to drive to notify police but decided to remain and watch for his attackers to leave. He made a U-turn, returned to the house, and started blowing his horn and yelling. He attracted the attention of two passersby and asked them to call police.

Police officers Dennis Dierkes and Jack Russell responded to the call. Both officers said the victim was not intoxicated and Officer Dierkes described him as "[u]pset, and visibly shaken and appeared to be hurting in the head and appeared to have bruises on it." The victim described to the officers the man who took his wallet as being in his early- to mid-twenties, five feet ten inches to six feet tall, with a heavy build, and wearing blue jeans. He described the woman as very short, four feet ten or eleven inches, 100 to 115 pounds, and in her mid- to late-twenties. Officer Dierkes was admitted to the residence at 8917 Newby by Tuwana Fox. She told Officer Dierkes that "nobody had just run into the house, and the only ones in the house were her sisters and herself." Ms. Fox granted the officers permission to search for persons but not for property. Officer Dierkes searched the first floor of the residence and found Ms. Fox's "three sisters and ... about five or six children." Officer Russell entered through the side door and searched the basement where he found defendant and Pamela Fox in a room variously described at trial as "a closet" and "a storage room." The door to the closet was slightly ajar; no light was on inside. Officer Russell used his flashlight to locate defendant and Pamela Fox in the northeast corner of the closet. Defendant

had his back to the wall; Pamela Fox was pressed against him, her back to his stomach. The pair were taken from the basement to the backyard of the residence where the victim identified them as the man who took his wallet during the struggle and the woman who had flagged him down and attempted to take his car keys. According to the officers, Pamela Fox was approximately 27 years old, four feet nine inches tall, and weighed about 100 pounds. According to the victim, the defendant was wearing different trousers at the time of the identification from what he had been wearing at the time of the robbery.

The items taken from the victim, $600 in cash, a $190 paycheck, and personal papers and identification cards were never recovered.[1]

At trial, defendant presented two witnesses: alibi witness Shirley Washpun and himself. Ms. Washpun stated that she lived at the Newby address on November 22, 1984, and that defendant, who also lived there, was in the house all morning on that date. Defendant testified that he lived at the Newby address and that he and Pamela Fox had gone to the basement that morning for some privacy so that they could engage in oral sex, and approximately five minutes after they completed the sex act, Officer Russell found them in the closet.

Ms. Washpun had not testified at defendant's first trial, which resulted in a hung jury mistrial, and nothing in the record of this case indicates she had been requested or subpoenaed to do so.

During cross-examination of Ms. Washpun, assistant circuit attorney Murphy asked:

Q: Now, how long—how often have you talked to Earl about this case?

A: [Shirley Washpun] How often have I talked to him?

Q: Yes.

A: Really, I haven't been talking to Earl about the case.

Q: When was the last time, prior to today, that you talked to him?

A: Maybe a long time—he was going to trial the first time, I talked to him then.

Q: You didn't come in in that first hearing, did you?

A: No.

Ms. Kraft [defense attorney]: Objection, Your Honor, that's irrelevant.

The Court: Sustained.

Later, in his cross-examination of the defendant, Mr. Murphy asked:

Q: Earl, do you remember testifying the last time we had a hearing on this?

A: [Defendant] Uh-huh.

Q: And do you remember—

A: —yes.

Q: —me asking you who lived there at that time?

A: Yes.

Q: And do you remember telling me, I asked you: "Earl, who lived in the house there on Newby?" On page 7. And your answer was: "Pamela Fox, Aretha Fox, Tuwana Fox and Gloria Fox"; is that right?

A: And Shirley Williams [presumably, Shirley Washpun].

Q: You never mentioned Shirley Williams.

A: She was living there. She was living there but I don't think I mentioned it.

Q: You didn't mention her at all, did you?

A: No.

Q: And she didn't come in to testify the last time we had a hearing, did she?

Ms. Kraft: Objection, Your Honor, irrelevant.

Mr. Murphy: I think it's very relevant.

The Court: Sustained.

(Following discussion was held out of the hearing of the jury)

Ms. Kraft: Your Honor, at this time I would like to move for a mistrial that Mr. Murphy, on several occasions, mentioned

1. The testimony was that a warrant was never obtained to search the Newby residence and no search was ever made of the premises for the items taken from the victim or for the blue jeans worn by defendant at the time of the robbery.

the lack of testimony at the prior trial. I think that's improper conduct on the part of Mr. Murphy.

The Court: Any response?

Mr. Murphy: On what grounds? How is that improper?

Ms. Kraft: Well, Your Honor, I feel it's not proper impeachment of my client. Nothing being properly used for impeachment, and that is just placing improper inferences in the minds of the jury. There are no statements that Mr. Murphy has used or lack of testifying at the prior trial, and no statement that he needs to use that information to impeach her with. And I feel it's just improper.

The Court: Well, I'll sustain the objection, I don't think it rises to that level of this trial [mistrial]. Let's proceed.

(End of discussion out of hearing of jury)

In his closing argument, Mr. Murphy made this statement to the jury: "He [defendant] was able to locate this Shirley [Ms. Washpun], who never testified in the first incident [defendant's first trial]. And I suggest to you the reason she didn't testify is precisely because she's not there and it didn't happen that way." No objection was made to this statement.

■ Defendant's first point on appeal states:

The trial court erred by denying appellant's motion for mistrial after the state cross-examined defense witness Shirley Washpun and appellant about the fact that Ms. Washpun had not testified at an earlier hearing in the case because this matter was irrelevant to her credibility and prejudicial in that there was no showing of any reason why she should have felt compelled to testify, or appellant to call her to testify, and the prosecutor persisted in this line of inquiry although appellant's objections were sustained, and emphasized the subject in closing argument.

The law governing declaration of a mistrial is set forth succinctly in *State v. Da-* vis, 653 S.W.2d 167 (Mo. banc 1983) where the court said:

The declaration of a mistrial is a drastic remedy that should be employed only in those extraordinary circumstances in which prejudice to the defendant can be removed no other way. Whether a mistrial should be declared rests largely within the discretion of the trial court because the trial court observes the incident that precipitates the request for a mistrial and is in a better position than is the appellate court to determine what prejudicial effect, if any, the incident has on the jury. The trial court's decision whether to grant a mistrial will not be disturbed in the absence of an abuse of discretion. (Citations omitted.)

*Id.* at 176.

Our task is to determine, as a matter of law, whether the trial court abused its discretion in refusing to declare a mistrial. *State v. Cook,* 676 S.W.2d 915, 917 (Mo. App.1984).

The trial court sustained the objection to the question asked Ms. Washpun. Defendant admitted on cross-examination that he had not named Ms. Washpun as living at the Newby address when he was asked about the residents during his first trial. The court sustained defendant's objection to the question, "And she didn't come in to testify the last time we had a hearing, did she?" However, a request for a mistrial was denied. The state argues the questions were proper, citing *State v. Hemphill,* 669 S.W.2d 633, 635–36 (Mo.App.1984), where we held that questions on cross-examination as to why the witness did not step forward sooner with her alibi are relevant to the credibility of the witness. Here, the court believed the questions to both witnesses to be improper and objections were sustained. We find no abuse of discretion in failing to grant a mistrial.

■ The complaint regarding the closing argument was not properly preserved. *Hemphill,* 669 S.W.2d at 636. We have examined the arguments, along with the entire record, and conclude there is no manifest injustice or miscarriage of justice to

constitute plain error. Rule 30.20. "The strength of the state's case is a prime factor in the determination of whether the trial court's error [if any] resulted in a manifest injustice or a miscarriage of justice." *State v. McKinley,* 689 S.W.2d 628, 633 (Mo.App.1984). Our examination of the record indicates the state made a strong case.

■ Defendant's second point alleges the trial court erred in permitting investigating police officer Dierkes, a witness for the state, to answer this question: "If someone is standing at the rear of the house [in which the defendant had been arrested], could someone exit the house and not have been seen?" The victim had testified that, after the attack, he had observed his four assailants enter a residence. The victim parked his automobile and watched the house into which his assailants had fled until police officers arrived. During this period of surveillance, the victim did not see anyone leave the residence.

Defendant contends that the question to Officer Dierkes called for an impermissible conclusion on the part of a non-expert witness. Rather, defendant asserts, the jury should have been allowed to draw its own conclusion about whether a person stationed as the victim was could have seen anyone leave the house.

"The opinion of a lay witness is inadmissible unless the fact in issue is 'open to the senses.'" *Beuttenmuller v. Vess Bottling Co. of St. Louis,* 447 S.W.2d 519, 526 (Mo. 1969). Courts of this state have had numerous opportunities to determine whether certain fact issues are "open to the senses." For example, in *State v. Eaton,* 504 S.W.2d 12 (Mo.1973), a police officer testified he had observed a comparison of the end of a pair of pliers found in a burglary suspect's automobile with the indentation in the aluminum facing of the door of the burglarized residence and found that the pliers fit the indentation perfectly. The court stated that the officer had:

[T]estified to a fact issue open to the sense of sight and did not purport to do so in the role of an expert witness. Whether a tool and an indentation fit each other is not a matter requiring training, expertise or specialized knowledge. Anyone looking at the tool and the indentation could testify whether the two fit each other.

*Id.* at 21.

In this case, Officer Dierkes had been at the scene and had observed the exterior of the Newby residence from various vantage points. He was aware of the location of the house's doors and any other possible means of exit, all of which were "open to the senses." He was competent to testify about his personal observations and could answer the prosecutor's question which called for a simple common sense deduction based on his observations. It is only logical that if one were standing at the rear of a building, he could not see the front.

Judgment affirmed.

DOWD, P.J., and CRIST, J., concur.