STATE of Missouri, Plaintiff–
Respondent,

v.

Mark E. IMMEKUS, Defendant–
Appellant.

No. 22746.

Missouri Court of Appeals,
Southern District,
Division Two.

Aug. 31, 2000.

Motion for Rehearing or Transfer
Denied Sept. 22, 2000.

Application for Transfer Denied
Oct. 31, 2000.

Kent Denzel, Asst. Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Linda Lemke, Asst. Atty. Gen., Jefferson City, for respondent.

PHILLIP R. GARRISON, Judge.

Mark E. Immekus ("Defendant") appeals his conviction by a jury of first-degree assault, § 565.050,[1] armed criminal action, § 571.015, and felonious restraint, § 565.120. The trial court found him to be a prior and persistent offender, and sentenced him to consecutive terms of life, twenty years, and ten years, respectively. Defendant also appeals the sentence imposed for the first-degree assault conviction. We affirm Defendant's conviction, but set aside the sentence imposed for the assault conviction, and remand for the imposition of a new sentence.

■ Included in the issues raised by Defendant on this appeal is the sufficiency of the evidence. In testing the sufficiency of evidence, all evidence and inferences reasonably drawn from the evidence are viewed in the light most favorable to the verdict, and contrary evidence and inferences are disregarded. *State v. West*, 939 S.W.2d 399, 401 (Mo.App. W.D.1996).

Viewed in that manner, the evidence demonstrates the following:

Defendant had dated Saveda Bollinger ("Victim") before leaving the state, after which she started dating Mike McQueen ("McQueen"). On October 3, 1996, Defendant returned to Missouri, and Victim and McQueen took him to Victim's home to get clothes and belongings that he had left there before leaving the state. After doing so, Victim and McQueen took Defendant to a motel in Rolla where Victim rented a room for Defendant to spend the night. That evening, Defendant called Victim and told her that he had taken pills from her home and that if she did not come alone to the motel to see him, he would attempt suicide by taking them.

Victim and McQueen started for the motel, but Victim dropped McQueen off at a grocery store and told him to walk to the motel. She instructed McQueen that if she was not outside when he arrived at the motel, it meant she was having trouble and he should come to the door. When Defendant answered Victim's knock on the door, he threw her to the floor, hit her in the face, and pulled her by her hair to a chair where he tied her up with a cord. Defendant proceeded to hit Victim in the face several times, cut her face with a single-edged razor, cut her hair to a length of 1½ inches (it had come to the middle of her back), cut the back of her head, and shaved her eyebrows off. While he was doing these things, he told Victim that he was going to make her "as ugly as her boyfriend," and he put a mirror in front of her, saying, "Aren't you pretty now?" At one point, Defendant told her that if she thought she had been beaten, "now you're going to be beat," and also said, "Dead time, bitch." In addition to hitting her in the face, Defendant also ripped off Victim's pants, tearing the buttons on the fly off, and kicked her in the lower part of the stomach with his cowboy boots. Defendant used a tape recorder he had taken

1. All references to statutes are to RSMo 1994 and all references to rules are to Missouri Rules of Criminal Procedure (2000), unless otherwise indicated.

from Victim's house to record some of his comments about what he had done to her and what he intended to do, including that he intended to inject her with methamphetamine. He also told her that his friend, Rick Fisher, was going to arrive and rape her.

The motel clerk's office was directly beneath the room that Victim had rented for Defendant. The clerk heard loud banging coming from that room and thought they were tearing up the room. She called the room and told Defendant that he was going to have to curtail their activities because she didn't want the room torn up, and he said "Okay." McQueen then arrived at the motel and asked the clerk to call the room after he got no answer by knocking on the door to see if Victim was ready to go. The clerk called Defendant again and asked to speak to Victim. Defendant gave the phone to Victim who told the clerk, "Oh, help me, please God …" The clerk then called 911.

At some point Rick Fisher arrived at the room but, although he was acquainted with Victim, he did not recognize her because of her condition. At that time, Victim was still bound in the chair and was bleeding from her wounds. Fisher said, "I don't need this, I'm leaving," and Defendant said he was going with him. Defendant untied Victim and threw her clothes at her. As soon as Victim could get her clothes on, she left the room and ran downstairs. Fisher then left the motel room and got in his car. Defendant followed Fisher out and got in the car with him and they left. The police and an ambulance arrived at the motel shortly after they left. Some officers left the scene to look for Defendant and Fisher, and one or more officers went to the room to see if anyone else was there. They entered the room through the door which Defendant left open and saw the room in disarray, hair on the floor, a chair with a cord tied around the arms, and blood on the wall behind the chair. Word shortly came that Fisher's car had been stopped, and the officers in the room

left to assist in the arrest, pulling the motel room door shut resulting in it being locked.

Victim was taken to the hospital where she was found to have severely swollen eyes, cuts on both cheeks, a cut on the back of her head, and cut-off hair. The physician who examined her had to hold her eyes open in order to examine them because of the swelling. Although Victim was not kept in the hospital overnight, she came back the next day for a CT scan that revealed a fracture of the left orbital floor (underneath the eye in the cavity that the eye sits in). The risks of a fractured orbital floor include the possibility of paralysis of the eye by trapping the optic nerve, and of infection. She also had a loose front tooth that was cracked and eventually fell out. Other facts will be discussed in the body of this opinion, as they become relevant to the points raised on appeal.

Defendant contends in his first point on appeal that the trial court erred in overruling his motion for judgment of acquittal at the close of the evidence. He argues that the State failed to prove the offenses of first-degree assault and armed criminal action beyond a reasonable doubt "because it did not produce sufficient evidence to convince a rational trier of fact that [he] attempted to kill or cause serious physical injury." In conjunction with this, he argues that the jury found that he did not actually cause serious physical injury, and the only reasonable inference from the evidence was that he intended "simply to cause injury and to humiliate [Victim], but did not intend to cause serious injury." He also concludes that the armed criminal action conviction cannot stand without the underlying felony of first-degree assault.

Defendant was charged with the class A felony of assault in the first degree by attempting "to kill or cause serious physical injury to [Victim] by cutting her with a razor blade and striking her with his fists and in the course thereof inflicted serious

physical injury ..." Section 565.050.[2] He claims in this point that the State failed to prove the required element that he attempted to kill or cause serious physical injury to Victim.

He argues that there was "absolutely no evidence" that he attempted to *kill* Victim because he had a razor blade and had her tied in a chair, and if he had any thoughts of killing her he could easily have done so. With reference to the element of attempting to cause serious physical injury, Defendant points out that the jury found that he did not actually cause serious physical injury to Victim.[3] He acknowledges that this finding does not foreclose the possibility that he *attempted* to cause such injury, and he agrees that his actions may be probative of that element. While he admits that he committed "assaultive" acts by beating Victim about the face, causing "superficial cuts to her face and head," kicking her "two or three" times, and cutting her hair, he argues that these actions do not show an intent to cause serious physical injury, defined by § 565.002(6) as "physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body." He points to testimony of a doctor he called at trial who testified that based upon his review of the CT scan and medical records, Victim did not sustain "serious" physical injuries. He also contends that he did not have the purpose to cause protracted loss or impairment of the function of any part of Victim's body, and in support argues that he "had the means to do this had he wished," but that "[w]hat the evidence shows is an attempt to humili- ate, to cause physical injury, and probably emotional injury, but not protracted loss or impairment." In support of his contention that he did not have the purpose of causing serious disfigurement, he points to evidence that the cuts Victim sustained were superficial.

In determining whether there was sufficient evidence to support a conviction, we accept as true all of the evidence and inferences favorable to the State, and disregard all evidence and inferences to the contrary. *State v. Grim*, 854 S.W.2d 403, 405 (Mo. banc 1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993). Appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *Id.*

Intent, as an element of assault, is generally not susceptible of direct evidentiary proof and may be established by circumstantial evidence or inferred from surrounding facts. *State v. White*, 847 S.W.2d 929, 933 (Mo.App. E.D.1993). "A jury is permitted to draw such reasonable inferences from the evidence as the evidence will permit, and may believe or disbelieve all, part, or none of the testimony of any witness." *Id.* In determining a defendant's mental state, the jury is entitled to consider his conduct before the act, the act itself and his subsequent conduct. *Id.*

Defendant's claim that he did not intend to cause serious physical injury (physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment

---

2. Section 565.050 provides:

A person commits the crime of assault in the first degree if he attempts to kill or knowingly causes or attempts to cause serious physical injury to another person.

Assault in the first degree is a class B felony unless in the course thereof the actor inflicts serious physical injury on the victim in which case it is a class A felony.

3. Two verdict-directing instructions were given by the State. Instruction No. 5 required a finding that Defendant attempted to kill or cause serious physical injury to Victim and that he "in the course of such conduct caused serious physical injury" to her. Instruction No. 7 was the same except that it did not require a finding that Defendant actually caused serious physical injury to Victim. The jury found Defendant guilty under Instruction No. 7.

of the function of any part of the body) to Victim lies in sharp contrast to evidence which the jury was entitled to believe. He hit her in the face enough times and hard enough that he broke the bone that forms the eye socket. That type of injury can take two weeks to three months to heal, and risks associated with it include paralysis of the optic nerve, which controls movement of the eye, and susceptibility to infection. He also hit her hard enough that she had a cracked tooth that eventually broke off with the result that she had trouble eating for a period of time, and eventually had a crown installed that was still causing problems at the time of trial, over two years after the injuries. Victim had burn marks that were sore for two weeks from the cords tied around her wrists. She also had scarring from the cuts inflicted by Defendant, one of which still existed at the time of trial that she covered with makeup.

■ Disfigurement means to deface or mar the appearance or beauty of someone. *State v. Bledsoe*, 920 S.W.2d 538, 540 (Mo.App. E.D.1996). In *Bledsoe*, the court held that a cut on the chin of 1½ inches that left scarring qualified as serious disfigurement. *Id.* In this regard, we also note that *permanent* disfigurement is not required for disfigurement to qualify as "serious physical injury." *State v. Williams*, 740 S.W.2d 244, 246 n. 1 (Mo. App. E.D.1987). Accordingly, the cutting of Victim's long hair so that it was 1½ inches long, and the shaving of her eyebrows could also qualify as serious disfigurement. The same is true concerning Victim's eyes that were so swollen that medical personnel had to hold them open to examine her.

Defendant's contention in this point is also inconsistent with his actions and statements after the incident for which he was convicted. He told the police that he wished he had more time so he could do the job "right," "I'm proud of what I did," "[t]he bitch will never forget me now," and "I don't care if I spend the rest of my life in jail; it was worth it." These statements demonstrate that he intended to cause Victim even more harm than he did, and would have done so if he had not been interrupted. His fleeing of the scene also demonstrates his consciousness of guilt.

The evidence was sufficient to support a finding that Defendant attempted to cause serious physical injury. The first point is denied.

■ Defendant's second point is based on the denial of his motion for judgment of acquittal at the close of the evidence, and in sentencing him on the armed criminal action count. He contends that the State failed to prove the offense beyond a reasonable doubt by failing to produce sufficient evidence that he committed the offense of first-degree assault "by, with, or through the use, assistance or aid of a dangerous instrument."[4] He argues that if he committed the offense of first-degree assault, it was by hitting and kicking Victim and not by using the razor blade, because the cuts to her face "were small, superficial cuts, not serious physical injuries." While he admits that he used the razor blade to cut Victim's hair and to cause cuts, which he points out did not require stitches, he portrays this as something other than first-degree assault (knowingly causing or attempting to cause serious physical injury).

As we perceive Defendant's contention under this point, it is that if he committed a first-degree assault, it was with his fists and not the razor, arguing that "[t]here was no mention of the blade until he had

4. Section 571.015.1 provides, in part, that a person is guilty of armed criminal action if they commit any felony "by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon." A "dangerous instrument" is defined in § 556.061(9) as "any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury," and "deadly weapon" is defined in § 556.061(10) in part as "a switchblade knife, dagger, billy, blackjack or metal knuckles."

[Victim] in the chair and had hit her several times." He also says, "*if* the blows constituted a first degree assault, that assault was completed before [Defendant] ever used the razor blade or showed it to [Victim]." Instead, he argues that any action he took with the razor constituted a third, rather than first, degree assault.[5]

The razor was a "dangerous instrument" within the definition of that term in that it was "readily capable of causing death or other serious physical injury" under the circumstances under which it was used in this case. As we discussed in the first point on this appeal, Defendant did commit the felony of first-degree assault by using the razor in addition to his fists and feet. He clearly knowingly caused or attempted to cause serious physical injury by using the razor. As indicated, he caused serious disfigurement with the razor, and as evidenced by his words, intended to do even more damaging acts with that instrument. There was sufficient evidence from which the jury could have found Defendant guilty of armed criminal action. The trial court did not err in denying Defendant's motion for judgment of acquittal at the close of the evidence and in sentencing him for armed criminal action. This point is denied.

In his third point, Defendant claims trial court error in its failure to suppress a tape recording seized from the motel room, and in overruling his objections when the tape was offered in evidence and played for the jury. In support, he contends that the audiotape was seized as the result of a warrantless, unreasonable search of the motel room.

The tape contains statements by Defendant that he had "cut her hair, kicked the f— out of her, busted her face up, it's just the beginning, I'm going to inject her full of methamphetamine ... I want this all documented on what I'm doing to her, I'm enjoying the f— out of this, this has been coming for a long time, you're a no good ... piece of s— stupid slut who f— with the wrong one, I'd go to prison for the rest of my life, I'd be happy as f— looking at you because now you been beat."

In his motion to suppress, Defendant contended that the tape was illegally seized from the motel room as a result of a search which was without a warrant, without probable cause, and which did not come within the scope of any exception to the requirement that a warrant be obtained. He also alleged that while the motel room was rented for him, he did not consent to the search; the search was not incident to a lawful arrest; there was no evidence that the tape had been used or was about to be used in any way upon which "this criminal charge could arise"; the tape was not in plain view; and the seizing officers were not at a place where they had a legal right to be.

When the officers arrived at the motel, they found Victim sitting on the curb crying, bruised and bleeding. Although her testimony was less than succinct, Victim testified that she believed that one of the officers asked her permission to go into the motel room, and that she had no objection to them doing so.[6] When the officers

---

**5.** A person commits third-degree assault pursuant to § 565.070 is when:

 (1) He attempts to cause or recklessly causes physical injury to another person; or

 (2) With criminal negligence he causes physical injury to another person by means of a deadly weapon; or

 (3) He purposely places another person in apprehension of immediate physical injury; or

 (4) He recklessly engages in conduct which creates a grave risk of death or serious physical injury to another person; or He

knowingly causes physical contact with another person knowing the other person will regard the contact as offensive or provocative.

 (5) He knowingly causes physical contact with another person knowing the other person will regard the contact as offensive or provocative.

**6.** As indicated, the testimony on this point was not precise or necessarily consistent. The officer who responded to the scene testified at the hearing on the motion to suppress that he did not recall if he asked Victim's

went to the room to see if anyone was still there, they found the door open, and upon looking in, they saw hair on the floor by a chair, blood on the wall by the chair, and cords tied to the chair arms. They then received word that suspects in the case were being stopped, and they left to assist in the arrest, pulling the door shut (thereby locking it). After Defendant and Fisher were arrested, the motel clerk let two officers in, using her key. The officers searched the room and seized several items including the tape that is the subject of this point on appeal. At trial, the portion of the tape made during the time Defendant had Victim in the motel room was played for the jury.

When a defendant moves to suppress evidence, the State has the burden to show by a preponderance of the evidence that the motion should be overruled. *State v. Young*, 991 S.W.2d 173, 175 (Mo.App. S.D.1999). On review, the appellate court determines only whether there was sufficient evidence to support the trial court's ruling, reversing only if that decision was clearly erroneous. *Id.* "If the trial court's ruling is plausible in light of the record viewed in its entirety, this court may not reverse the ruling even though convinced it would have weighed the evidence differently had it been sitting as trier of fact." *Id.* at 176. Accordingly, we defer to the trial court's opportunity to assess the credibility of witnesses and weigh the evidence, and we are free to disregard evidence and inferences contrary to the trial court's ruling. *Id.*

A warrantless search is presumptively invalid under the United States Constitution, and it is the State's burden to prove justification for such a search upon a defendant's motion to suppress. *State v. Looney*, 911 S.W.2d 642, 644 (Mo. App. S.D.1995). "Generally, a seizure without probable cause and without the authority of a warrant is reasonable only to the extent that the government's inter-

est in conducting the search and seizure outweighs the individual's reasonable expectation of privacy." *Id.* "To receive the protection of the Fourth Amendment, an individual must have an actual subjective expectation of privacy in the place being searched and that expectation must be reasonable." *Id.* "Where an individual has voluntarily given up control of his property, courts have found that the individual has relinquished any legitimate expectation of privacy in that item." *Id.* Thus, when a party abandons property he no longer has a reasonable expectation of privacy with regard to it at the time of a search or seizure. *State v. Thompson*, 820 S.W.2d 591, 594 (Mo.App. E.D.1991).

A person has no standing to complain of the search or seizure of property that he has voluntarily discarded, left behind, or otherwise relinquished his interest so that he no longer retains a reasonable expectation of privacy with regard to it at the time of the search or seizure. *State v. Lingar*, 726 S.W.2d 728, 736 (Mo. banc 1987), *cert. denied*, 484 U.S. 872, 108 S.Ct. 206, 98 L.Ed.2d 157 (1987). An abandonment is primarily a question of intent and all relevant circumstances existing at the time of the alleged abandonment should be considered. *Id.* "Where an item is discarded in connection with flight from the law, protection against governmental intrusion upon that item is neither a 'reasonable' nor a 'legitimate' expectation." *Id.*

In the instant case, after Fisher arrived and told Defendant that "I don't need this" and "I'm leaving," Defendant then allowed Victim to leave the room after untying her hands and giving her clothes back. Fisher then left the room and started his car. He was followed by Defendant who left the motel room door open and got in the car with Fisher. They were apprehended after leaving the scene.

Here, the evidence supports a finding that Defendant abandoned the motel room

permission to go into the room, and later he said that he did not ask her if he could go in.

and all that was in it when, after releasing Victim, he left the motel. This is fortified by the fact that he left the motel room door open to the world when he departed, and the fact that, having released Victim in a beaten and bloody condition, it is reasonable to believe that he could expect the police to be arriving shortly and that he was attempting to avoid capture. He certainly could expect that either the clerk or the police would investigate the contents of the open room where a crime had obviously been committed. Accordingly, the trial court did not err in overruling the portion of Defendant's motion to suppress referred to in this point. The point is denied.

Defendant's fourth point is based on the trial court's overruling his motion for a mistrial when Fisher testified that he knew Victim "before [Defendant] went to jail." He argues that this statement prejudiced him before the jury by portraying him as a prior offender, resulting in his conviction for reasons wholly irrelevant to his guilt.

Defendant had been incarcerated in Texas shortly prior to the incident that is the basis of his conviction. In fact, Victim had picked him up in Texas upon his release from a federal penitentiary three days prior to this incident. Prior to trial, Defendant filed a motion in limine to suppress all evidence of his prior convictions. Although the trial court's ruling on this motion is less than clear, at one point the trial court said that evidence of Defendant's prior convictions was "excluded unless he takes the stand," and at another, the court reiterated that the witnesses had been told not to mention the fact that Defendant was incarcerated, and that if they did, "I'll have to decide whether that remark whatever it may be, is prejudicial."

Fisher was called as a witness for the State. During his direct examination, the following occurred:

Q (Prosecutor): And when did you first meet [Victim]?

A: [Defendant] brought her by our house one day. She was his girlfriend.

Q: Do you recall what year that was?

A: No, not really.

Q: Do you recall if it's been in the last five years?

A: Yes, it's been in the last five years.

Q: Has it been in the last three years?

A: *It was before [Defendant] went to jail.*

(Emphasis added.)

Defendant then requested a mistrial, saying that the "basis of it is the motion in limine that [he] previously filed." The prosecutor informed the trial court that she only had a few minutes to speak with the witness [7] and had not advised him of the prior motion in limine.[8] The trial court then denied the motion for a mistrial, instructing the prosecutor to speak with the witness, and recessed the trial to permit that to happen. Thereafter, there was no further mention of Defendant's prior conviction.

 As Defendant appropriately points out, evidence of other crimes is inadmissible if offered to show that a defendant is a person of bad character, or a person with a propensity to commit criminal acts, and trial courts should be wary of evidence concerning other crimes because of the prejudicial nature of such evidence.

---

7. Fisher had been subpoenaed to appear a day earlier but failed to do so. He was then taken into custody for failing to appear and was brought to the courtroom by the sheriff's office only a short time before court convened on the second day of trial. The prosecutor and Defendant's attorney both represented to the court that they had not had an opportunity to speak with Fisher, and the trial court granted them a total of 15 minutes to do so. Fisher was called to the stand at the conclusion of that time.

8. We gather that both sides understood that the motion had been sustained, but, as indicated, that is less than clear from the record.

*State v. Dudley,* 912 S.W.2d 525, 528 (Mo. App. W.D.1995). On the other hand, a mistrial is a drastic remedy to be used only in extraordinary circumstances. *State v. Johnson,* 968 S.W.2d 123, 134 (Mo. banc 1998), *cert. denied,* 525 U.S. 935, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998). "Because the trial court is in a better position to observe the evidence and its impact, the granting of a mistrial rests within its sound discretion. Appellate review is for abuse of discretion only." *Id.*

■ There is no indication in the record that the prosecutor intentionally caused the information about Defendant's prior incarceration to be elicited from this witness. In analyzing the prejudicial effect of an uninvited reference to other crimes, courts generally examine five factors: 1) whether the statement was, in fact, voluntary and unresponsive, or whether the prosecutor deliberately attempted to elicit the information; 2) whether the statement was singular and isolated, and whether it was emphasized or magnified by the prosecutor; 3) whether the remarks were vague and indefinite, or whether they made specific reference to crimes committed by the defendant; 4) whether the court promptly sustained defense counsel's objection, and instructed the jury to disregard the volunteered statement; and 5) whether in view of the other evidence presented and the strength of the state's case, it appeared that the comment played a decisive role in the determination of guilt. *State v. Smith,* 934 S.W.2d 318, 320–21 (Mo.App. W.D.1996).

■ In this case, the prosecutor's question did not call for the information revealed by Fisher about the Defendant having been previously incarcerated, and there is no indication in the record that she intentionally attempted to elicit that information. The answer about which Defendant complains was volunteered and unresponsive. There was no emphasis placed on the information about Defendant's prior incarceration, and Defendant does not point out where it was ever men-

tioned again in the trial. The comment did not refer to a specific crime, and did not even indicate whether Defendant had been convicted of a crime; only that he had been in jail. The trial court promptly dealt with the situation by causing the prosecutor to speak with Fisher to insure that no further comments would be made. Defendant did not request that the court instruct the jury to disregard the comment, but rather only requested a mistrial. Finally, the strength of the State's case was significant and such that the singular comment could not reasonably be said to have played a decisive role in the determination of guilt. Accordingly, we are unable to find an abuse of discretion in the trial court's denial of a mistrial. Defendant's fourth point is denied.

■ Defendant's fifth point relates to the trial court's denial of his motion to replace one of the jurors with an alternate after the juror was noted to be "sleepy, and was closing his eyes and slouching in his chair." At the end of the first trial day, after excusing the rest of the jurors, the trial court addressed one of the jurors as follows:

> The Court: Counsel? Mr. Norris, I've been watching you and you seem to be sleepy. Are you having difficulty staying awake?
> Juror Norris: Well, a little. You know, I slept a lot yesterday. And it is kind of dry and warm, you know. Yes, I am.
> The Court: Well, would you feel better if you were not on the jury? We have to have jurors that are able to stay awake.
> Juror Norris: Well, you know, I don't mind it, Your Honor. You know, I'm not used to just sitting this long, and it is a little warm in here.
> The Court: If during the course of tomorrow if you feel that you need to get up and stretch, would you let me know?
> Juror Norris: Yes, sir.

The next morning, before the trial resumed, Defendant requested a mistrial be-

cause Juror Norris "was sleeping during the evidence." That motion was denied, with the trial court stating that he had watched the juror and he did not sleep although he would close his eyes, occasionally would slouch in his chair, was obviously tired, but that " I did not notice him sleeping." Defendant's attorney then requested that the alternate replace Juror Norris, which was also denied.

As we perceive the thrust of Defendant's point relied on, it is that the trial court refused the request to replace Juror Norris with an alternate. He cites *State v. Ralls*, 8 S.W.3d 64, 65 (Mo. banc 1999), for the proposition that "[t]rial by jury means something more than a trial by twelve [people]; the term imports a trial by twelve [people] possessing the requisite qualifications for jury duty, impartial between the parties, living within the jurisdictional limits of the court, drawn and selected by impartial and disinterested officers, duly impaneled under the direction of a competent court, and sworn to render an impartial verdict according to the law and evidence. . . ."

■ The trial court's response to alleged juror misconduct lies within its sound discretion. *State v. Tabor*, 657 S.W.2d 317, 320 (Mo.App. E.D.1983). In *Tabor*, the Eastern District held that it was not error for the trial court to have failed to replace a juror who momentarily had gone to sleep and was awakened by the sheriff. In *State v. Whitman*, 788 S.W.2d 328, 337 (Mo.App. E.D.1990), a juror kept closing her eyes and nodding her head. The trial court indicated in the record that it had kept an "eye" on the juror and that her eyes had been open most of the time. The *Whitman* court said that in such circumstances much lies within the discretion of the trial court, and it denied relief because of the failure to replace the juror. In doing so, the appellate court noted that the trial court kept

an eye on the juror, and made a record indicating its observations. *Id.*

In this case, the trial court acknowledged that he had been watching Juror Norris and that while he would close his eyes and occasionally slump in the chair, he did not believe that he had been sleeping. This is one of those situations where the trial court was in a far better position to gauge the extent to which the juror was paying attention to the evidence, and we are unable, on this record, to conclude that it abused its discretion in refusing to replace the juror in question. This point is denied.

■ Defendant's sixth point is based on the trial court's refusal to give his tendered Instruction X, which he argues would have instructed on third-degree assault as a lesser included offense of first-degree assault. Although the trial court did give another instruction on third-degree assault tendered by Defendant, he argues that the refused instruction was more appropriate under the evidence.

Instruction X would have authorized a conviction for third-degree assault if the jury found that Defendant "caused physical injury to [Victim] by cutting her with a razor blade and striking her with his fist," while Instruction No. 9 submitted by Defendant, and given by the court, authorized a conviction for third-degree assault if the jury found that he "attempted to cause physical injury to [Victim] by cutting her with a razor blade and striking her with his fist." Defendant argues that Instruction No. 9 limited its scope to whether he "attempted" to cause physical injury to Victim, which was not a proper submission under the evidence because he "did cause injury, not merely attempt to do so." [9]

As pointed out by the State, § 565.070 defines third-degree assault as (1) attempting to cause or recklessly causing physical injury to another by means of a deadly weapon; or (2) with criminal negligence causing physical injury to another person

---

**9.** Defendant points out that this point is in the alternative to his first point in which he disputed the sufficiency of the evidence to prove

that he attempted to kill or cause serious physical injury.

by means of a deadly weapon; or (3) purposely placing another person in apprehension of immediate physical injury; or (4) recklessly engaging in conduct which creates a grave risk of death or serious physical injury to another person; or (5) knowingly causing physical contact with another person knowing the other person will regard the contact as offensive or provocative. It appears that both of Defendant's proposed instructions were intended to be based on § 565.070.1(1). Instruction No. 9, which was given, hypothesized that Defendant "attempted to cause physical injury," which was obviously supported by the evidence. Instruction X, which was refused, would have authorized a conviction of third-degree assault if Defendant "caused physical injury." . While it is obvious that the evidence demonstrated that Defendant did cause physical injury to Victim, § 565.070.1(1) prohibits "recklessly" causing physical injury, a qualification that was not included in the instruction. The refused instruction, therefore, did not properly hypothesize the portion of the statute upon which it was based. The trial court does not commit error in failing to give an instruction which misstates the legal standard for the theory presented in the instruction. *State v. Parkhurst,* 845 S.W.2d 31, 36–37 (Mo. banc 1992). The trial court did not err in failing to give Instruction X. This point is denied.

■■■ Defendant's final point on appeal seeks plain error review of his sentence of life imprisonment for the class A felony of first-degree assault because the jury found him guilty of the class B level of the offense. He argues that the trial court's sentence of life imprisonment for a class B felony "will inexorably result in manifest injustice and a miscarriage of justice if [he] is not resentenced."

Defendant was found guilty of attempting to kill or cause serious physical injury to Victim, but he was not found guilty under another instruction which would have authorized a conviction upon a finding that he attempted to kill or cause serious physical injury, *and* that in the course of

such conduct he also "caused serious physical injury." As indicated earlier, § 565.050.1 defines assault in the first degree as attempting to kill or knowingly causing or attempting to cause serious physical injury to another person. Subsection 2 of that statute provides that "[a]ssault in the first degree is a class B felony unless in the course thereof the actor inflicts serious physical injury on the victim in which case it is a class A felony." His conviction was, therefore, a class B felony.

The trial court found Defendant to be a prior and persistent offender. Pursuant to § 558.016 the maximum authorized punishment for a conviction of a prior and persistent offender of a class B felony is thirty years. Here, the State concedes that this was the maximum imprisonment to which the trial court could have sentenced Defendant for the first-degree assault conviction. The trial court, however, sentenced Defendant to consecutive sentences of life imprisonment for the first-degree assault conviction, twenty years for the armed criminal action conviction, and ten years for the felonious restraint conviction.

Because Defendant did not object to the sentencing on the basis now argued, he seeks plain error review under Rule 30.20, which authorizes relief for errors affecting substantial rights when the court finds that manifest injustice or miscarriage of justice has resulted. Here, the State concedes that Defendant is entitled to be resentenced on the first-degree assault conviction. We agree that the failure to do so would affect Defendant's substantial rights and would result in a manifest injustice. Accordingly, Defendant is entitled to be resentenced on that conviction.

■■■ The State, however, raises as an issue about whether the trial court is also entitled to resentence Defendant for the other two convictions. It contends that a complete resentencing is permitted, relying on *State v. Sexton,* 929 S.W.2d 909 (Mo.App. W.D.1996). *Sexton* and *North Carolina v. Pearce,* 395 U.S. 711, 726, 89 S.Ct. 2072, 2081, 23 L.Ed.2d 656, 670

(1969), cited in *Sexton*, both involved situations where earlier convictions had been reversed and on retrial the defendant was sentenced to more total imprisonment than originally imposed. As said in *State v. Madewell*, 928 S.W.2d 381, 384 (Mo.App. S.D.1996), "[t]he *Pearce* doctrine applies to cases in which criminal convictions are overturned and, thereafter, defendants are sentenced to more severe punishments than were originally imposed." Here, no conviction is being overturned. The case is being remanded only for resentencing for the first-degree assault conviction in accordance with the applicable statutory range of punishment. We decline to direct that the trial court may also resentence Defendant on the other two convictions.

The judgment of conviction is affirmed. The sentence imposed for the first-degree assault conviction is set aside and the case remanded to the trial court to resentence Defendant on that conviction consistent with this opinion.

PREWITT, J., and MONTGOMERY, P.J., concur.