

# In the Missouri Court of Appeals
# Eastern District

## DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED101764 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis City |
| vs. | ) | |
| | ) | Honorable Margaret M. Neill |
| MARCUS HUGHES, | ) | |
| | ) | |
| Appellant. | ) | FILED: September 15, 2015 |

## Introduction

Appellant Marcus Hughes ("Hughes") appeals from the trial court's judgment entered after a jury verdict. The jury found Hughes guilty on two counts: forcible rape and second-degree assault. Hughes presents two points on appeal. First, Hughes argues that the prosecution did not present sufficient evidence that Victim suffered "serious physical injury," and the trial court thus erred in denying Hughes's motion for judgment of acquittal at the close of evidence. Second, Hughes argues that the trial court abused its discretion in admitting State's Exhibit Six ("Exhibit Six"), a photograph of Victim in the hospital. Hughes contends that the evidence was inadmissible and that he suffered prejudice from the admission of the evidence. Because there was sufficient evidence that Victim suffered serious physical injury, and because the trial court did not abuse its discretion in admitting Exhibit Six, we affirm the judgment of the trial court.

## Factual and Procedural History

Hughes was charged with forcible rape, forcible sodomy, and assault in the first degree in the City of St. Louis. After a jury trial, Hughes was convicted of forcible rape and the lesser-included offense of assault in the second degree. The charges stemmed from an incident that started on Friday night, December 3, 2004, and continued into the early morning hours of Saturday, December 4, 2004.

Because Hughes contests the sufficiency of the evidence for his second-degree assault conviction, we set out the facts most favorable to the guilty verdict. State v. Crawford, 68 S.W.3d 406, 408 (Mo. banc 2002). Victim[1] was twenty-five years old at the time. On December 3, 2004, between 9:00 and 10:00 P.M., Victim drove herself to meet two friends, Terry and Erin, at Blueberry Hill, a restaurant and bar in University City, Missouri. Victim, Terry, and Erin stayed at Blueberry Hill until the following morning between 12:00 and 12:30 A.M.

Next, the three friends decided to go to Rocket Bar, located in the City of St. Louis at Locust Avenue and 20th Street. Victim left her car at Blueberry Hill and rode with Terry and Erin. At Rocket Bar, Victim became very upset after a dispute arose involving her current and former boyfriends. Ultimately, Victim left Rocket Bar in tears, on foot, around 1:30 or 2:00 A.M. Victim was "tipsy" when she left the bar; the temperature was cold and Victim did not have a winter coat or gloves. Victim started walking towards her car, which was still at Blueberry Hill.

After walking a few blocks, Victim noticed a man following her on her right side. Victim asked the man to stop following her and to leave her alone; the man continued following her. The man identified himself as "Calvin"—although he was later identified as Hughes. Hughes

---

[1] Due to the sensitive nature of this case, we refer to the victim only as "Victim." For other witnesses, we omit surnames.

was African-American, thin, and said he was twenty-seven years old. Hughes told Victim he had just gotten off work and was waiting for a bus. During the walk, Victim hailed a cab. As Victim got into the back of the cab, Hughes got in the other side. At that point, Victim felt grateful to both Hughes and the cab driver for keeping her safe.

The cab drove both Victim and Hughes to Victim's car. Hughes asked Victim to drive Hughes to Hughes's aunt's house. Victim agreed. Hughes said the house was close and began directing Victim from the passenger seat. Before long, Hughes directed Victim to an area that appeared dark and secluded. When Victim attempted to put her car in reverse, Hughes pushed the gear shift into park. Victim testified that she believed Hughes wanted to steal her car, so she took the key out of the ignition and got out of the car. Hughes also got out of the car and started running toward her. As Hughes grabbed Victim, Victim threw her keys into a nearby field to keep Hughes from stealing the car.

Hughes began pulling Victim up a hill and closer to a building. Victim screamed and pled with Hughes to stop; in response, Hughes punched Victim in the face and she fell to the ground. As Victim lay face up, Hughes removed the scarf that Victim had been wearing as a belt and used it to strangle her. Victim stopped screaming as her oxygen supply was restricted. Hughes then removed Victim's jeans and panties. After turning Victim over to look at her buttocks, Hughes put Victim on her back and pulled his pants down. Hoping to dissuade Hughes, Victim falsely claimed she had a sexually transmitted disease. Nevertheless, Hughes performed oral sex on Victim and then had sexual intercourse with her. During the sexual intercourse, Victim prayed out loud.

After Hughes ejaculated, he pulled up his pants and fastened the scarf over Victim's eyes as a blindfold. Hughes dragged Victim to another area and began rubbing dirt on her vagina.

3

Victim again pled with Hughes to let her go; Hughes punched her repeatedly in the face. Victim would fall to the ground after a punch, get back up, and Hughes would punch her again. After a series of punches, Victim decided to lay still and play dead. Hughes left the scene, and Victim removed the scarf from her eyes. Victim immediately ran toward the street, still naked from the waist down. A passerby with a car picked her up and drove her to the hospital. Victim's face was swollen and covered in bruises.

At the hospital, staff treated Victim and administered two rape kits. Victim had a busted lip, a black eye, a swollen face, and dirt, cuts, and scrapes on her body. The evidence did not reveal any facial fractures, dental injuries, or broken bones; but, Victim was in a great deal of pain, especially on her right side. Victim received treatment and was discharged from the hospital later that day. During Victim's treatment, police interviewed Victim, the cab driver, and the passerby who brought Victim to the hospital. Police also investigated the crime scene, where they found Victim's car, jeans, boots, and panties. Police recovered DNA evidence from Victim's boot and from swabs in Victim's rape kit; the DNA evidence implicated an unknown male. Police were unable to identify the suspect for several years.

In May 2011, more than six years later, the DNA evidence was matched to Hughes. An additional testing of the evidence in 2012 confirmed this match. In June 2011, police placed a photo of Hughes into a photo array and Victim accurately identified Hughes as her attacker. The State charged Hughes with one count each of forcible rape (Count I), forcible sodomy (Count II), and first-degree assault (Count III). The State introduced photographic exhibits depicting the injuries Victim sustained. Exhibits One, Two, Three, and Five showed close-up images of Victim's face when Victim was in the hospital. Exhibit Six also showed Victim's face, but it was taken from the foot of Victim's hospital bed. In Exhibit Six, a blanket covered Victim's

4

entire body, up to the neck; the view of Victim's face was zoomed-out in comparison to Exhibits One, Two, Three, and Five. Hughes raised the defense that he and victim engaged in consensual sexual acts and that he only hit Victim after Victim first hit him in the back of the head. Hughes claimed that he had not intended to kill Victim or to break any bones.

The jury found Hughes guilty of forcible rape and the lesser-included offense of second-degree assault. Because Hughes was a prior and persistent offender, the trial court sentenced Hughes. The sentences were twenty years in prison for forcible rape and ten years in prison for second-degree assault. The sentences were run consecutively, for a total of thirty years. This appeal follows.

## Points on Appeal

Hughes presents two points on appeal. First, Hughes argues that the trial court erred in overruling his motion for judgment of acquittal at the close of all evidence because the State did not present sufficient evidence to convict Hughes of second-degree assault. Specifically, Hughes contends that the jury could not have reasonably concluded that Victim suffered "serious physical injury" as required for second-degree assault. Second, Hughes claims that the trial court abused its discretion in admitting and publishing Exhibit Six, a photograph of Victim in her hospital bed, to the jury because the exhibit was irrelevant and there was a reasonable probability that the admission prejudiced Hughes. Specifically, Hughes maintains that Exhibit Six was not relevant because the jury was already well-acquainted with the nature and extent of Victim's injuries, and that the evidence was offered for the sole purpose of arousing the emotions of the jury. Hughes asserts that but-for the admission of the exhibit, there is a reasonable probability that he would have been acquitted.

5

## I.    Point I—Sufficiency of the Evidence

Hughes challenges the sufficiency of the State's evidence with regard to his conviction for second-degree assault under Section 565.060(3).[2] To prove second-degree assault under Section 565.060(3), the State was required to prove beyond a reasonable doubt that Hughes recklessly caused "serious physical injury" to Victim. Hughes's challenge in this point relates only to the nature of the injuries suffered by Victim. Hughes posits that there was insufficient evidence to show Victim suffered "serious physical injury" as a matter of law. Therefore, Hughes believes the trial court erred in submitting the issue to the jury. We disagree.

### A.    Standard of Review

A challenge to the sufficiency of the evidence supporting a criminal conviction contests the trial court's ruling on the motion for judgment of acquittal. State v. Lane, 415 S.W.3d 740, 752 (Mo. App. S.D. 2013). As a result, "[t]he question of sufficiency arises *before* the case is put to the jury and is really an issue of whether the case should have been submitted to the jury." State v. Beggs, 186 S.W.3d 306, 312 (Mo. App. W.D. 2005) (emphasis added).

When determining the sufficiency of the evidence, we look at "the elements of the crime and consider each in turn." State v. Hines, 377 S.W.3d 648, 655 (Mo. App. S.D. 2012). Appellate review is limited to determining whether there is sufficient evidence that a reasonable juror might have found the defendant guilty beyond a reasonable doubt. State v. Grim, 854 S.W.2d 403, 411 (Mo. banc 1993); State v. Crawford, 68 S.W.3d 406, 408 (Mo. banc 2002). The fact finder, not this Court, determines the reliability, credibility, and weight of witness testimony. State v. Sumowski, 794 S.W.2d 643, 645 (Mo. banc 1990). Hence, we accept as true

---

[2] All statutory references are to RSMo (2000), unless otherwise indicated.

all evidence and inferences favorable to the state, and we disregard all evidence and inferences to the contrary. Grim, 854 S.W.2d at 405. Inferences must be drawn from established fact; they cannot be illogical or unreasonable. State v. West, 21 S.W.3d 59, 63 (Mo. App. W.D. 2000).

> B. Sufficient evidence exists to find that Victim suffered serious physical injury beyond a reasonable doubt.

A defendant commits second-degree assault when the defendant recklessly causes serious physical injury to another person. Section 565.060(3). Hughes challenges only the sufficiency of the evidence for the "serious physical injury" element. Serious physical injury means physical injury (1) that creates a substantial risk of death or (2) that causes serious disfigurement or (3) protracted loss or impairment of the function of any part of the body. Section 565.002(6) (Cum. Supp. 2008). The fact that a person recovers from injury without residual damage does *not* eliminate the possibility that the person suffered serious physical injury. State v. Oliver, 291 S.W.3d 324, 327 (Mo. App. S.D. 2009). The three categories of serious physical injury encompass different types of injuries.

First, "substantial risk of death" suggests seriousness in an urgent medical sense: circumstances which give rise to apprehension of life-threatening circumstances. State v. Kruger, 926 S.W.2d 486, 488 (Mo. App. E.D. 1996). The question is whether the injuries inflicted in the assault, viewed objectively, raise a legitimate concern either that the victim could die or could suffer more than a momentary loss of bodily function. State v. Kee, 956 S.W.2d 298, 301 (Mo. App. W.D. 1997).

Second, "serious disfigurement" suggests seriousness in a more aesthetic sense. "Disfigurement" means to deface or mar the appearance or beauty of someone. Kruger, 926 S.W.2d at 488. "Injuries suffered by assault victims will differ and therefore whether a victim suffers serious disfigurement is dependent upon the evidence of a particular case." State v.

7

Bledsoe, 920 S.W.2d 538, 540 (Mo. App. E.D. 1996) (en banc). Visibility of scarring, particularly on the face, size of scars, and the presence of additional injuries are all factors in determining disfigurement. Id. "Serious disfigurement" does not require permanent disfigurement. State v. Williams, 740 S.W.2d 244, 246 n.1 (Mo. App. E.D. 1987).

Third, "protracted loss or impairment of the function of any part of the body" suggests a relatively minor physical injury—there is no minimum degree of trauma—that bothers a victim for a long time. The concern is not the degree of injury, but the temporal aspect. Oliver, 291 S.W.3d at 327. A "protracted" loss or impairment is something short of permanent, but more than a short duration. State v. Brokus, 858 S.W.2d 298, 301 (Mo. App. E.D. 1993). Whether an injury is sufficiently protracted depends on the circumstances of each case. Oliver, 291 S.W.3d at 327.

There is no question that substantial evidence exists to support a finding of serious physical injury under the second category of serious disfigurement. State's Exhibits One, Two, Three, and Five show a close-up images of Victim's face taken on the night of the assault. Those images—taken from various angles—show abrasions to the lip, bruising and discoloration on both cheeks, scratches on the right side of Victim's mouth, and a black eye. Exhibit Two shows that Victim's right eye barely opened. Testimony corroborated the injuries and confirmed that Victim was in significant pain. Medical personnel testified that Victim had been beaten "very badly." Finally, both the photographs and the testimony indicated bruising around Victim's neck from the scarf used to choke her. Based on this evidence, a reasonable juror could conclude that Victim suffered serious disfigurement beyond a reasonable doubt.

Hughes argues that Victim's injuries were "the type of injuries . . . that usually heal, leaving little to no trace of ever having existed." However, serious disfigurement does not need

8

to be permanent. Bledsoe, 920 S.W.2d at 540. In State v. Roper, 136 S.W.3d 891 (Mo. App. W.D. 2004), the victim suffered multiple visible injuries to her head and face. Id. at 898. The victim's lip was split and required stitches to close. Id. All of these disfigurations usually heal, leaving little to no trace of ever having existed, yet the court found sufficient evidence of serious disfigurement to submit the case to the jury. Id. Likewise, in State v. Immekus, 28 S.W.3d 421 (Mo. App. S.D. 2000), the court found that cutting the Victim's hair to a length of $1\frac{1}{2}$ inches and shaving the Victim's eyebrows could qualify as serious disfigurement. Id. at 427. The Immekus court also found that eyes "so swollen that [the] medical personnel had to hold them open to examine" was sufficient to establish serious disfigurement. Id. In State v. Raines, 118 S.W.3d 205 (Mo. App. W.D. 2003), the victim suffered extensive swelling, bruising, and scratching around the head. Id. at 211. The Raines court cited Immekus, reasoning that if having hair cut short and shaved eyebrows is sufficient evidence of serious disfigurement, the jury in Raines *a fortiori* had sufficient evidence of serious disfigurement. Id. We see no reason to distinguish Victim's injuries, as described above, from Roper, Immekus, and Raines; the injuries described in these cases all eventually could heal with little trace of having ever existed, but the injuries are all sufficient for a reasonable juror to find serious disfigurement.

Hughes further contends that serious physical injury could not occur because Hughes did not use some type deadly weapon or dangerous instrument. This argument conflicts with a plain reading of the statute. State v. Daniel, 103 S.W.3d 822, 826 (Mo. App. W.D. 2003) ("When analyzing the meaning of a criminal statute, we gauge the General Assembly's intent from the words used in the statute and give effect to that intent.") (internal quotations omitted). The definition of "serious physical injury" does not require any particular instrument or method of causing injury; instead, it is concerned with the severity or length of the injury. See Section

9

565.002(6). If the General Assembly wanted to require the use of a deadly weapon for second-degree assault under Section 565.060(3), it would have done so explicitly.[3] Because the definitions of "serious physical injury" and of second-degree assault omit reference to the use of a dangerous or deadly instrument, it makes little sense to infer such a requirement here.

Because the evidence of Victim's injuries to her face and neck was sufficient for a reasonable juror to find "serious physical injury" beyond a reasonable doubt, the trial court did not err in submitting the issue to the jury. Point One is denied.

## II. Point II—Admission of Exhibit Six

Hughes challenges the trial court's decision to admit Exhibit Six into evidence. Hughes argues that Exhibit Six, a photograph showing victim in the hospital, was not relevant because it was cumulative to four other exhibits showing victim's face and other witness testimony. Therefore, Hughes believes the trial court abused its discretion in admitting the evidence. We disagree.

### A. Standard of Review

An appellate court will reverse a trial court's decision to admit evidence only if the trial court (1) abused its discretion, and (2) the opponent of the evidence was prejudiced. State v. Mabry, 285 S.W.3d 780, 785 (Mo. App. E.D. 2009). A trial court has broad discretion over questions concerning relevance and the admissibility of photographs. State v. Patton, 419 S.W.3d 125, 133 (Mo. App. E.D. 2013). An abuse of discretion must be clearly against the logic of the existing circumstances and so arbitrary and unreasonable as to shock the sense of justice

---

[3] In fact, Section 565.060(2)—another form of second-degree assault—does explicitly require "a deadly weapon or dangerous instrument." Elsewhere, the General Assembly added different requirements to other forms of second-degree assault: Section 565.060(5) requires the "discharge of a firearm" and Section 565.060(6) requires criminal negligence while operating a motor vehicle. These explicit requirements are not present in Section 565.060(3).

10

and indicate a lack of careful consideration. State v. Peeples, 288 S.W.3d 767, 775 (Mo. App. E.D. 2009). The test for prejudice is whether the improper admission was outcome-determinative. State v. Davis, 226 S.W.3d 167, 171 (Mo. App. W.D. 2007).

      B.      The trial court did not abuse its discretion in admitting Exhibit Six.

A trial court has broad discretion in the admission of photographs. Patton, 419 S.W.3d at 133. Exhibit Six depicts Victim in her hospital bed on the night of the assault. Victim's entire hospital bed is visible with a blanket pulled up to Victim's neck. Only Victim's head is visible. Exhibit Six was admitted alongside four close-up photographs of Victim's face in the hospital: State's Exhibits One, Two, Three, and Five. Exhibit Six is the only exhibit showing Victim's face from a distance. Hughes does not challenge the admissibility of Exhibits One, Two, Three, and Five.

The trial court did not abuse its discretion in admitting Exhibit Six. Photographs are relevant if they show the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute proof of an element of the crime or assist the jury in understanding the testimony. State v. Rousan, 961 S.W.2d 831, 844 (Mo. banc 1998). Photographs of Victim's face depicting swelling and bruises, including Exhibit Six, are clearly relevant to determine whether Victim suffered serious physical injury to her face.

Thus, Hughes can only argue that Exhibit Six was cumulative evidence with respect to State's Exhibits One, Two, Three, and Five. "Evidence is said to be cumulative when it relates to a matter so fully and properly proved by other testimony as to take it out of the area of serious dispute." Black v. State, 151 S.W.3d 49, 56 (Mo. banc 2004). This is precisely what Hughes argues in his brief: "Due to the testimony of multiple State witnesses and the admission of numerous other photographs of [Victim] at the hospital, jurors were well-acquainted with the

11

nature and extent of [Victim's] injuries. State's Exhibit Six provided the jury with no additional information about them." In other words, Hughes argues that Exhibit Six was cumulative; but, Hughes also admits that the issue of whether Victim suffered "serious physical injury" was disputed during trial.[4] Exhibit Six merely showed another angle for the jury to determine whether Victim suffered serious physical injury. Thus, in admitting Exhibit Six, the judge did not act in an arbitrary and unreasonable way in determining that Exhibit Six was relevant and not cumulative. The trial court was within its discretion in admitting Exhibit Six.

Even were we to find Exhibit Six to be cumulative, admission of Exhibit Six was not prejudicial. The test for prejudice is whether the improper admission was outcome-determinative. Davis, 226 S.W.3d at 171. Outcome-determinative prejudice occurs when "erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." State v. Black, 50 S.W.3d 778, 786 (Mo. banc 2001). The evidence must be so prejudicial that it deprived the accused of a fair trial. State v. Tokar, 918 S.W.2d 753, 761 (Mo. banc 1996). State's Exhibits One, Two, Three, and Five all depict Victim's injuries to her face and neck; Hughes does not argue that these exhibits should have been excluded. Exhibit Six depicts the same injuries as the other exhibits, but from a different perspective. Realistically, Exhibit Six is the least likely of the five exhibits to influence the jury in finding serious physical injury. Exhibit Six shows Victim's injuries from several feet away, whereas the other exhibits are close-up views of Victim's face. The other exhibits, by virtue of being closer, more vividly depict Victim's gruesome injuries. Because there is *not* a

---

[4] And, in fact, Hughes argued that the State did not meet its burden in proving serious physical injury. See supra Point I.

12

reasonable probability that the jury would have acquitted but-for Exhibit Six's admission to evidence, particularly when balanced against Exhibits One, Two, Three, and Five, admission of Exhibit Six was not outcome-determinative. Thus, Hughes cannot show prejudice.

Because the trial court did not abuse its discretion in admitting Exhibit Six, and because the admission of Exhibit Six did not prejudice Hughes, the trial court did not err. Point Two is denied.

Conclusion

The decision of the trial court is affirmed.

_Kurt S. Odenwold_

KURT S. ODENWALD, Judge

Sherri B. Sullivan, J., concurs.
Patricia L. Cohen, J., concurs.

13