

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED107837 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Louis County |
| vs. | ) | |
| | ) | Honorable Kristine A. Kerr |
| TRENTON E. FORSTER, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 17, 2020 |

## Introduction

Trenton E. Forster ("Forster") appeals his convictions for murder in the first degree, assault of a law enforcement officer in the second degree, and two counts of armed criminal action. Forster raises four points on appeal. In his first point, Forster argues that the mandatory sentence of life without parole ("LWOP") imposed under Section 565.020[1] for the shooting death of Officer Blake Snyder ("Officer Snyder") is unconstitutional as applied to him as an eighteen-year-old defendant because the mandatory sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. In his remaining points, Forster challenges the trial court's admission of testimony from Officer Snyder's wife ("Wife"), a photograph of Officer Snyder in uniform, and excerpts from a phone call Forster made while in jail awaiting trial. Forster argues the challenged evidence did not establish any elements or facts related to the

---

[1] All Section references are to RSMo (2016) unless otherwise noted.

charged offenses and was more prejudicial than probative. The Supreme Court of Missouri recently denied a similar constitutional challenge to Section 565.020's mandatory LWOP as applied to defendants eighteen years old and older in State v. Barnett, 598 S.W.3d 127 (Mo. banc 2020). Accordingly, we have jurisdiction over this appeal and find Barnett dispositive of Forster's constitutional claim. With regard to Forster's evidentiary challenges, Wife's testimony and Officer Snyder's photograph were relevant to the murder victim's identity and were properly admitted into evidence by the trial court. Because the anti-police sentiments expressed in Forster's phone call were cumulative to other evidence properly admitted at trial, including evidence proffered by Forster, Forster cannot demonstrate any prejudice from the admission of his jail-house phone call. We affirm the judgment of the trial court.

Factual and Procedural History

On October 6, 2016, St. Louis County Police Officers Snyder and John Becker ("Officer Becker") responded to a 9-1-1 call from a residential house. In uniform and in a marked police vehicle, Officer Snyder pulled behind Forster's car. Officer Snyder approached Forster's driver's side door and tried to talk to Forster. Officer Snyder stated "show me your hands" and repeated "police, show me your hands." Forster then shot Officer Snyder in the face.

Officer Becker took cover and told Forster to show his hands. Forster responded, "I have a f---ing gun, kill me." As Forster kept moving within his car, Officer Becker opened fire on him. Forster said, "F---ing shoot me, I have a gun," and pointed his gun at Officer Becker. Officer Becker reloaded and fired several more shots at Forster, who dropped his gun and was handcuffed. Officer Snyder died from his gunshot wound. In addition to the handgun used to shoot Officer Snyder, police recovered an AK-47, ammunition, and drug paraphernalia from Forster's car.

The State charged Forster with murder in the first degree for the shooting of Officer Snyder, assault of a law enforcement officer in the second degree with respect to Officer Becker, and two counts of armed criminal action. At the time of the offenses, Forster was eighteen-years-and-four-months old.

The case proceeded to trial on January 30, 2019. Over Forster's objection, the State called Wife as its first witness. Wife testified that she and Officer Snyder had been married for three years and had a two-year-old son. Wife further testified that her husband had been a police officer with St. Louis County for four years and loved his job. Wife identified a photograph of Officer Snyder wearing his police uniform (the "Photograph"), which the trial court admitted into evidence over Forster's objection. Wife testified about being taken to the hospital, where she learned that her husband had died.

Over the course of several days, the State called over twenty witnesses. The State adduced evidence of Forster's conduct and mental state leading up to the incident. The evidence related Forster's social media as well as Forster obtaining a handgun and an AK-47 within five days before the shooting incident. Forster's social media posts in the months leading up to the incident included statements such as "I want f--- the police carved into my grave[,]" "I feel bad for him, man, I hate the police so much[,]" and "Please help me if possible, man, I'll explain why if I have to, but I need Percocet, dude, like I'm legit about to go pull my .9 on a cop or some, I'm losing my f---ing mind, dude." A witness testified that the day before the incident, Forster had a handgun and said that if he got pulled over by police it "wasn't going to end well" and that he would "shoot a cop before" going to prison.

Over Forster's objection, the State also played an audio recording and submitted a transcript of an excerpt from a June 2017 phone call (the "Phone Call") between Forster and his

3

father. The phone call occurred nine months after the shooting incident while Forster was in jail awaiting trial. During this call, Forster said that his father's "calling the police" on Forster was "some bi--- a-- sh--." Forster continued by saying that he did not mean to say his father was "a bi--- . . . but it's just in general. I don't know, I just—it's—f--- the police, you know what I'm saying." Forster's father then talked about how most police are good people doing their job. Forster responded by saying that "most officers in general are people that have been f---ing like bullies most of their life, or have a reason to want to get back at other people."

Forster maintained at trial that he lacked the requisite mental state to commit murder in the first degree, and that his act of shooting Officer Snyder to death constituted murder in the second degree. The defense called several witnesses, including forensic psychologist Dr. Patricia Zapf ("Dr. Zapf"), to address Forster's mental state at the time of the shooting. Dr. Zapf specifically testified regarding Forster's mental health problems. Dr. Zapf evaluated Forster prior to trial and conducted in-person interviews with Forster in June 2017. Dr. Zapf explained that Forster suffered from bipolar disorder, attention deficit hyperactivity disorder, generalized anxiety disorder, panic disorder, and polysubstance use disorder, which impacted Forster's behavior and thinking when he shot Officer Snyder. Dr. Zapf further testified about the "barrage of social media stuffed with all this [sic] antisocial attitudes that he has where he is saying F the police, and I don't care, and I want to take them out," noting that Forster experienced homicidal ideation associated specifically with police officers in connection with his bipolar disorder. Dr. Zapf concluded that Forster's conduct was not a deliberate attempt at "suicide by cop" and that:

> At the time of the offense [Forster] was manic, suicidal, paranoid and emotionally unstable. His initial action of shooting Officer Snyder appears to have been instinctive, reflexive [sic] action, and the reaction of being approached from the side under dark environmental conditions, and internal conditions of heightened fear, paranoia and hopelessness.

4

The jury returned guilty verdicts on all counts.

Prior to sentencing, Forster objected to the imposition of the statutorily mandated sentence of LWOP for the count of first-degree murder. In his written objection, Forster stated that he was eighteen-years-and-four-months old at the time of the offense and noted that imposing a sentence of LWOP on persons under the age of eighteen had been ruled unconstitutional. Forster then reasoned that LWOP violated the Eighth and Fourteenth Amendments by constituting cruel and unusual punishment as applied to him because the four-month age difference between him and persons under eighteen years old was an arbitrary distinction in light of brain science studies referenced in recent jurisprudence from the United States Supreme Court. The sentencing court overruled the objection and sentenced Forster to LWOP pursuant to the statutory mandate on the count of first-degree murder, seven years in prison on the count of second-degree assault on a law enforcement officer, and ten years in prison on each of the two counts of armed criminal action, with all counts to run consecutively.

Forster appeals his conviction and sentence. Forster has moved to transfer this case to the Supreme Court on the basis that the appeal challenged the constitutionality of a state statute. This Court took the motion with the case.

<u>Points on Appeal</u>

Point One maintains the trial court erred in overruling Forster's sentencing objection to Section 565.020 as applied to Forster because the statute violates the Eighth Amendment to the United States Constitution's prohibition against cruel and unusual punishment. Specifically, Forster argues a national consensus exists that persons between the ages of eighteen and twenty-one are not fully adults, and that scientific data used to establish the judicial precedent declaring

the imposition of a mandatory LWOP is cruel and unusual punishment for offenders under eighteen years of age equally applies to offenders of his age.

Points Two, Three, and Four allege the trial court erred in admitting Wife's testimony, the Photograph, and the Phone Call, respectively, because such evidence was more prejudicial than probative in that the evidence did not establish any facts or elements relating to the offenses and only served to arouse the jury's sympathy.

Discussion

**I.       Point One—Constitutionality of Section 565.020's Mandatory LWOP as Applied to an Eighteen-Year-Old Defendant**

With his constitutional challenge to the mandatory imposition of LWOP for an eighteen-year-old defendant, Forster seeks to transfer this appeal to the Supreme Court of Missouri on the basis that he challenges the constitutionality of a statute, a category generally reserved for the exclusive jurisdiction of the Supreme Court of Missouri. See Mo. Const. art. V, sec. 3; McNeal v. McNeal-Sydnor, 472 S.W.3d 194, 195 (Mo. banc 2015).

The Supreme Court's "exclusive appellate jurisdiction is invoked when a party asserts that a state statute directly violates the constitution either facially or as applied." McNeal, 472 S.W.3d at 195 (internal citation omitted). "The constitutional issue must be real and substantial, not merely colorable." Id. (citing Mayes v. St. Luke's Hosp. of Kansas City, 430 S.W.3d 260, 270 (Mo. banc 2014)); State v. Henry, 568 S.W.3d 464, 479 (Mo. App. E.D. 2019). "When a party's claim is merely colorable, the intermediate appellate courts may review [the claim]." Henry, 568 S.W.3d at 479 (internal citation omitted).

Importantly, "[i]f the United States Supreme Court or Missouri Supreme Court has addressed a constitutional challenge, the claim is merely colorable and the intermediate appellate court has jurisdiction." Id. (internal citation omitted); D.E.G. v. Juvenile Officer of Jackson Cty.,

601 S.W.3d 212, 215 n.2 (Mo. banc 2020); Kirk v. State, 520 S.W.3d 443, 448 n.2 (Mo. banc 2017) (agreeing with recent appellate decisions denying transfer where the constitutional claim had already been addressed by the United States Supreme Court or the Missouri Supreme Court, because such claims do not involve fair doubt or reasonable room for disagreement but instead are merely colorable (internal citations omitted)).

The State maintains that Forster's constitutional claim is merely colorable because the Missouri Supreme Court recently rejected an identical constitutional challenge in Barnett. See Henry, 568 S.W.3d at 479. Forster contends that his arguments regarding a national consensus and transitional sentencing are distinct from those arguments addressed by Barnett and therefore transfer is appropriate. We disagree.

Initially, we acknowledge the State's assertion that Forster has not preserved this point for appellate review. The record reveals that Forster challenged the constitutionality of LWOP as applied to him before the trial court. However, Forster's arguments relating to a developed "national consensus and transitional sentencing" upon which he relies in seeking transfer to the Supreme Court are raised for the first time on appeal. See State v. Oates, 540 S.W.3d 858, 863 (Mo. banc 2018) (quoting State v. Driskill, 459 S.W.3d 412, 426 (Mo. banc 2015)) ("To preserve a constitutional claim of error, the claim must be raised at the first opportunity[.]"). "'If the constitutional challenge has not been properly preserved for appellate review,' the claim is not 'real and substantial,' and 'jurisdiction remains with [the appellate] court.'" Ritter v. Ashcroft, 561 S.W.3d 74, 84 (Mo. App. W.D. 2018) (quoting Joshi v. St. Luke's Episcopal Presbyterian Hosp., 142 S.W.3d 862, 866 (Mo. App. E.D. 2004)). As the following discussion shows, Forster's claim fails regardless of preservation, given that the claim is merely colorable in light of the binding precedent established in Barnett. See Barnett, 598 S.W.3d at 129 (internal

citations omitted) (noting whether the constitutional question was preserved for de novo review was irrelevant given that the claim failed regardless of applying de novo or plain-error review).

In Barnett, the Missouri Supreme Court thoroughly addressed and expressly rejected the proposition that Section 565.020's mandatory LWOP violates the constitutional prohibition against cruel and unusual punishment when applied to persons eighteen years old and older. Id. at 130–33. Barnett specifically analyzed the assertion that "newly available scientific evidence indicates [that] the justifications the United States Supreme Court relied upon to ban imposing the death sentence and mandatory life without the possibility of parole sentences for offenders younger than [eighteen] years old *apply with equal force to offenders who commit crimes at [nineteen] years old[.]"* Id. at 130 (emphasis added). Forster reasons that his claim is different from the claim raised in Barnett by refining his trial court argument. Forster now posits there exists a national consensus that individuals aged eighteen to twenty-one are not fully adults and that the scientific data showing mandatory LWOP is cruel and unusual for offenders under eighteen years old equally applies to offenders between eighteen and twenty-one years old. We reject Forster's limited interpretation of the holding in Barnett.

We read Barnett more expansively than Forster and find Barnett controlling in our disposition of this appeal. Barnett was clear in upholding the bright-line distinction between juvenile and adult offenders through its discussion of the academic literature presented in recent United States Supreme Court cases, other jurisdictions' treatment of criminal defendants under age twenty-one, as well as individualized sentencing as discussed below. See id. at 130–33.

Barnett held that the state and federal constitutional prohibitions against cruel and unusual punishment did not preclude sentences of LWOP under Section 565.020 based solely on the fact that the offender was nineteen at the time of the offense. Id. at 133. Barnett expressly

8

held that the law applicable to offenders who are less than eighteen at the time of their offense should not be judicially extended to nineteen-year-old defendants. Id.; State v. Martin, 607 S.W.3d 274, 279 (Mo. App. S.D. 2020) (citing Barnett, 598 S.W.3d at 133). To reach this conclusion, Barnett considered the latest United States Supreme Court jurisprudence, particularly Roper v. Simmons, 543 U.S. 551 (2005), Graham v. Florida, 560 U.S. 48 (2010), and Miller v. Alabama, 567 U.S. 460 (2012), and Montgomery v. Louisiana, —— U.S. ——, 136 S. Ct. 718 (2016)—the same judicial authority upon which Forster relies. Id. at 130. Barnett emphasized that Graham "reiterated [that] relief from a [LWOP] sentence for juvenile non[-]homicide offenders only applied to juveniles under younger [sic] than [eighteen] years old, citing Roper's bright-line age cutoff." Id. at 131 (citing Graham, 560 U.S. at 74–75; Roper, 543 U.S. at 574). Barnett continued that Miller "echoed Roper's and Graham's distinction between juveniles and adults when barring the imposition of [LWOP] sentencing on juveniles for homicide offenses." Id. (citing Miller, 567 U.S. at 471–78).

Barnett gave ample consideration to the defendant's claim regarding "evolving standards of decency" and the relevance, or lack thereof, of jurisdictional developments outside Missouri. Id. With regard to evolving standards of decency in 2020 and the relationship between brain and social science studies and the law, Barnett rejected the defendant's assertion that such current standards "mandate that [nineteen-]year[-]olds not be subject to mandatory [LWOP] sentences" and denied the request to extend the unconstitutionality of mandatory LWOP to nineteen-year-old offenders based on the claim that such offenders "also display the same traits as those juveniles under [eighteen] years old that were considered in barring the sentences in Roper and its progeny." Id. Additionally, while Forster offers as guidance non-Missouri statutes treating individuals aged eighteen to twenty-one as juveniles in certain circumstances, such as for alcohol

9

consumption and foster care eligibility, Barnett specifically noted that the "Court is not persuaded by . . . non-Missouri statutes [characterizing nineteen-year-olds as "youthful offenders" and deserving of special protection] in light of Missouri's definition of a juvenile offender" as an individual under eighteen years of age. Id. at 131–32. Barnett thus repudiates Forster's arguments concerning an alleged national consensus on the status of offenders aged eighteen to twenty-one. See id.

We turn next to Forster's argument that a bright-line distinction based upon age is no longer justified in light of the need for a transitional sentencing scheme for offenders between the ages of eighteen and twenty-one to account for their similarities to juvenile offenders. Again, we are obligated to adhere to Barnett's holding that a bright-line distinction currently remains the law both federally and in Missouri. Barnett reasons that "the Supreme Court explicitly acknowledged the reasoning supporting its judgment about juvenile offenders may be extended to those [eighteen] years of age and older, but it nevertheless set a bright-line age limit of [eighteen] under federal law." Id. at 133 (noting the United States Supreme Court in Roper, Graham, and Miller "explicitly stated three times [that] the cutoff between a juvenile and an adult is [eighteen] years of age and limited its holdings accordingly"). Barnett concludes that the Court "is guided by [United States] Supreme Court precedent, which clearly defines a juvenile as an individual younger than [eighteen] years of age for purposes of the considerations [the defendant] seeks." Id.

We agree with Barnett's commentary that continued justifications of the bright-line age cutoff between juveniles and adults are "policy considerations . . . better addressed to the legislature, which has the authority to amend [S]ection 565.020, if it determines Missouri should adopt the prevailing developments in psychology and brain science to expand the definition of

10

juvenile to include offenders older than [eighteen] years of age." Id. at 133.[2] Because Forster relies on the same scientific literature, Barnett precludes any attempt by this Court to further reflect on the merits of Forster's argument without overstepping our judicial mandate to interpret rather than legislate the law. See id.

The language and holding in Barnett clearly show that the Supreme Court of Missouri has addressed the same constitutional arguments raised in this appeal. Accordingly, Forster's claim is merely colorable and we have jurisdiction to review the appeal. D.E.G., 601 S.W.3d at 216 n.2; Kirk, 520 S.W.3d at 448 n.2; Henry, 568 S.W.3d at 479. Our interpretation of Barnett as controlling precedent for this appeal comports with a recently issued opinion from the Southern District denying transfer of a constitutional challenge to the same statute on equivalent grounds. See Martin, 607 S.W.3d at 279 (citing Barnett, 598 S.W.3d at 133). Martin found Barnett governed the constitutionality of Section 565.020's mandatory LWOP as applied to nineteen-year-old defendants. Id. Because Barnett recently and comprehensively addressed the same constitutional arguments with respect to nineteen-year-old offenders as raised by Forster with

---

[2] Indeed, the Missouri legislature did amend the language of Section 565.020 in 2016, which had remained unchanged since 1990:

> The offense of murder in the first degree is a class A felony, and, **if a person is eighteen years of age or older at the time of the offense, the punishment shall be either death or imprisonment for life without eligibility for probation or parole,** or release except by act of the governor. If a person has not reached his or her eighteenth birthday at the time of the commission of the offense, the punishment shall be as provided under section 565.033.

Section 565.020 (emphasis added). At the time the defendant committed the offenses in Barnett, Section 565.020 provided that first-degree murder shall be punishable by either death or imprisonment for life without eligibility for probation or parole. Id. at 129–30 (citing Section 565.020, RSMo 1994). Similarly, Section 565.020 was recodified without change in 2000, which was the version applying to the defendant in Martin. 607 S.W.3d at 279. The 2016 version of Section 565.020 applicable here does not alter the analysis for challenging whether its mandatory LWOP applies to an offender classified as an adult under Missouri law. The Missouri law at the time of Forster's offenses defined an "adult" as a person seventeen years of age or older. Section 211.021.1(1).

Further, prior to the offense in this case, the Missouri Legislature enacted Section 558.047, granting parole eligibility after twenty-five years to anyone who had received a sentence of life without parole before August 28, 2016, and "who was under eighteen years of age at the time of the commission of the offense or offenses." See Section 558.047.1(1).

11

respect to eighteen-year-old offenders, we are mandated to follow Supreme Court precedent and apply the holding of <u>Barnett</u> to the present case and deny the claim. <u>See id.</u> Point One is denied.

## II.        Points Two, Three, and Four—Evidentiary Challenges

In Points Two, Three, and Four, Forster argues the trial court erred in admitting evidence of Wife's testimony, the Photograph, and the Phone Call, respectively, because such evidence was more prejudicial than probative, did not establish facts or elements related to the offenses, and served only to arouse the jury's sympathy.

### A.        Standard of Review

"We will reverse a trial court's ruling on the admission of evidence only if the [trial] court clearly abused its discretion." <u>State v. Stokes</u>, 492 S.W.3d 622, 624 (Mo. App. E.D. 2016) (citing <u>State v. Forrest</u>, 183 S.W.3d 218, 223 (Mo. banc 2006)). "An abuse of discretion must be clearly against the logic of the existing circumstances and so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." <u>State v. Hughes</u>, 469 S.W.3d 894, 902 (Mo. App. E.D. 2015) (internal citation omitted).

To prevail on appeal, the defendant must demonstrate "prejudice, not mere error, and we will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." <u>Stokes</u>, 492 S.W.3d at 624–25 (citing <u>Forrest</u>, 183 S.W.3d at 223–24). "Outcome-determinative prejudice occurs when 'erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence.'" <u>Hughes</u>, 469 S.W.3d at 903 (quoting <u>State v. Black</u>, 50 S.W.3d 778, 786 (Mo. banc 2001)).

### B.        Analysis

#### 1.        Points Two and Three—Admission of Wife's Testimony and the Photograph

The admission of evidence, including witness testimony and photographic evidence, is within the sound discretion of the trial court.  See State v. Steele, 572 S.W.3d 549, 553 (Mo. App. E.D. 2019) (citing State v. Blurton, 484 S.W.3d 758, 769 (Mo. banc 2016)).  In order to be admissible, "evidence must be both logically and legally relevant."  Id. (citing Blurton, 484 S.W.3d at 777).  "Evidence is logically relevant if it tends to make the existence of a material fact more or less probable."  Id. (quoting Blurton, 484 S.W.3d at 777).  "Likewise, evidence is legally relevant when the probative value of the evidence outweighs its costs, such as unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness."  Id. (citing Blurton, 484 S.W.3d at 777; State v. Anderson, 76 S.W.3d 275, 276 (Mo. banc 2002)).

Here, Wife identified Officer Snyder as her husband and the victim of Forster's shooting.  Wife laid the foundation for the admission of the Photograph showing Officer Snyder in his police uniform prior to his death.  Forster contends that Wife's testimony and the Photograph were not legally relevant but only served to arouse the jury's sympathy.  Forster reasons this evidence should have been excluded as more prejudicial than probative.

"A trial court has broad discretion in the admission of photographs."  Hughes, 469 S.W.3d at 902 (internal citation omitted).  "A relevant photograph 'should not be excluded from evidence unless its prejudicial effect is greater than its probative value.'"  State v. Rios, 234 S.W.3d 412, 427 (Mo. App. W.D. 2007) (quoting State v. Rousan, 961 S.W.2d 831, 844 (Mo. banc 1998)).  A photograph is relevant if it "show[s] the scene of the crime, the identity of the victim, the nature and extent of the wounds, the cause of death, the condition and location of the body, or otherwise constitute[s] proof of an element of the crime or assist[s] the jury in understanding the testimony."  Hughes, 469 S.W.3d at 902 (citing Rousan, 961 S.W.2d at 844).

13

Notably, "a photograph is not rendered inadmissible because other evidence may have described what is shown in the photograph; nor is the State precluded from introducing the photograph because the defendant expresses a willingness to stipulate to some of the issues involved." State v. Quick, 334 S.W.3d 603, 611 (Mo. App. W.D. 2011) (quoting State v. Schneider, 736 S.W.2d 392, 403 (Mo. banc 1987)); see State v. Feltrop, 803 S.W.2d 1, 10 (Mo. banc 1991), *overruled on other grounds by* Joy v. Morrison, 254 S.W.3d 885 (Mo. banc 2008); State v. Reynolds, 837 S.W.2d 542, 546 (Mo. App. W.D. 1992). In particular, "[t]he [S]tate is not precluded from introducing the photograph simply because [the] defendant expressed a willingness to stipulate the identity of the victim." State v. Evans, 639 S.W.2d 820, 823 (Mo. 1982). "As the [S]tate has the heavy burden of proving defendant's guilt beyond a reasonable doubt, it should not be unduly limited in the quantum of its proof even though [the] defendant made a tentative offer to stipulate as to the identity of the victim." State v. Sherrill, 657 S.W.2d 731, 737 (Mo. App. S.D. 1983) (internal citation omitted).

Indeed, Missouri courts have consistently affirmed a trial court's admission of a murder victim's photograph, whether depicted alive or deceased, as relevant and not substantially more prejudicial than probative. See, e.g., State v. Sweet, 796 S.W.2d 607, 615 (Mo. banc 1990), *abrogated on other grounds by* Sanders v. State, 807 S.W.2d 493 (Mo. banc 1991) (finding photograph of deceased highway patrol trooper in uniform was admissible as relevant to the identification of the victim); State v. McMillin, 783 S.W.2d 82, 100 (Mo. banc 1990), *abrogated on other grounds by* Morgan v. Illinois, 504 U.S. 719 (1992) (finding photograph of murder victim and her children standing in front of a Christmas tree was admissible even though the victim's identity was not in dispute); State v. Davis, 653 S.W.2d 167, 175 (Mo. banc 1983), *overruled on other grounds by* Kuyper v. Stone Cty. Comm'n, 838 S.W.2d 436 (Mo. banc 1992)

(finding photograph of police officer in uniform prior to murder was admissible as relevant to the identification of the victim); Reynolds, 837 S.W.2d at 546 (finding a high school graduation photograph of the murder victim was admissible as relevant to the identification of the victim, despite the defendant's willingness to stipulate to the victim's identity); State v. Kincade, 677 S.W.2d 361, 366 (Mo. App. E.D. 1984) (finding a photograph of the victim taken one year before his death was admissible as relevant to the identification of the victim and not solely serving to inflame the emotions of the jurors). "If the photograph satisfies the test for admissibility, the fact that it might tend to agitate the jury is not a sufficient cause to reject it." Davis, 653 S.W.2d at 175 (internal citation omitted) (reasoning further that a photograph of the uniformed officer's body showing the wounds sustained would have had a greater tendency to inflame the jury than the photograph of the uniformed officer alive that was admitted into evidence).

In this case, we find no error in the trial court's admission of either Wife's testimony or the Photograph because both were legally relevant to the identity of the murder victim. See Hughes, 469 S.W.3d at 902 (citing Rousan, 961 S.W.2d at 844). This victim-identity evidence was not rendered inadmissible merely because other evidence may have proved Officer Snyder's identity or because his identity was not disputed, as the State bears the burden to prove its case. See Feltrop, 803 S.W.2d at 10; Quick, 334 S.W.3d at 611 (citing Schneider, 736 S.W.2d at 403); Reynolds, 837 S.W.2d at 546.

The fact that evidence as to Officer Snyder's identity may have agitated or disturbed the jury does not warrant its exclusion but merely reflects the reality of the offense committed—the fatal shooting of a police officer. See Davis, 653 S.W.2d at 175 (internal citation omitted); Evans, 639 S.W.2d at 823; Quick, 334 S.W.3d at 610 (discussing State v. Davis, 318 S.W.3d

618, 640 (Mo. banc 2010)) (noting "that while the evidence was 'potentially prejudicial,' any potential prejudice arose from 'the gruesome nature of [the] crimes, not from any action of the State in the method of presenting the footage and photographs"); Sherrill, 657 S.W.2d at 737 (internal citation omitted).

With regard to prejudice, we are not persuaded that Forster has demonstrated the necessary prejudice to reverse the trial court's evidentiary rulings. See Stokes, 492 S.W.3d at 624–25 (citing Forrest, 183 S.W.3d at 223–24). Even if the trial court erroneously admitted the evidence at issue, we reject any assertion that there is a reasonable probability the jury would have convicted Forster of murder in the second degree rather than murder in the first degree "when considered with and balanced against all evidence properly admitted[.]" See Hughes, 469 S.W.3d at 903 (quoting Black, 50 S.W.3d at 786). In particular, Forster claims that the evidence prejudicially impacted the jury's assessment of whether he deliberated for purposes of his conviction for first-degree murder. Significantly, Forster does not explain how the outcome of his trial and the jury's consideration of the element of deliberation would have differed absent Wife's testimony identifying Officer Snyder and the admission of a single photograph of Officer Snyder at the beginning of a multi-day trial with over twenty State-called witnesses. See Davis, 653 S.W.2d at 175 (internal citation omitted).

Because the trial court's admission of Wife's testimony and the Photograph was not clearly against the logic of the existing circumstances nor so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration, we find the trial court did not abuse its discretion. See Hughes, 469 S.W.3d at 902 (internal citation omitted). Points Two and Three are denied.

### 2.    Point Four—Admission of the Phone Call

Point Four maintains that the trial court erred in admitting audio and transcribed excerpts of the Phone Call between Forster and his father in which Forster expressed his contempt for police.  Forster argues on appeal that such evidence should have been excluded as being inflammatory and more prejudicial than probative.

Improper admission of evidence requires reversal only if the defendant demonstrates trial court error that was so prejudicial as to deprive the defendant of a fair trial.  Stokes, 492 S.W.3d at 624–25 (citing Forrest, 183 S.W.3d at 223–24).  "Outcome-determinative prejudice occurs when 'erroneously admitted evidence so influenced the jury that, when considered with and balanced against all evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence.'"  Hughes, 469 S.W.3d at 903 (quoting Black, 50 S.W.3d at 786).

"A complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other related admitted evidence."  State v. Brandolese, 601 S.W.3d 519, 535–36 (Mo. banc 2020) (quoting Saint Louis Univ. v. Geary, 321 S.W.3d 282, 292 (Mo. banc 2009)).  "Cumulative evidence is additional evidence that reiterates the same point."  Id. (internal quotation omitted).  "Evidence challenged on constitutional grounds that is cumulative of other, properly admitted evidence cannot have contributed to a defendant's conviction and so is harmless beyond a reasonable doubt."  Id. (internal citations omitted).

Here, the main thrust of Forster's argument against the admission of the Phone Call is that it contained inflammatory statements showing Forster's animosity towards the police through statements such as "F--- the police[,]" that "most officers in general are people that have been f---ing like bullies most of their life, or have a reason to want to get back at other people[,]"

and that his father's "calling the police" on Forster was "some bi--- a-- sh--." Forster asserts that the negative feelings towards police expressed in the Phone Call made from jail occurring nine months after the offenses were committed were merely inflammatory and not probative of any elements of the charged homicide offenses.

The State posits that Forster's negative sentiments towards police expressed by him in the Phone Call were admissions of a party opponent relevant to establishing consciousness of guilt. See, e.g., State v. Simmons, 233 S.W.3d 235, 237–38 (Mo. App. E.D. 2007) ("[T]he admission of a criminal defendant is relevant and material if it tends to incriminate the defendant, to connect the defendant to a crime, or to manifest the defendant's consciousness of guilt." (internal quotation omitted)) (finding the defendant's statements in a jail phone call with his son that he was sorry for what he did were relevant and material evidence of a consciousness of guilt on the charge of sexually abusing his daughter). The State suggests that Forster's post-arrest statements made with knowledge of their recording were relevant to establishing motive for his offenses committed against police officers and in proving deliberation on the first-degree murder charge as well as relevant to proving Forster knew Officer Becker was a law enforcement officer as required to convict on second-degree assault on a law enforcement officer. See Steele, 572 S.W.3d at 553 (citing Blurton, 484 S.W.3d at 777); Stokes, 492 S.W.3d at 625; Simmons, 233 S.W.3d at 237.

Critically, we cannot reverse the trial court's ruling unless we find that the admitted evidence was prejudicial to the outcome of Forster's trial. See Brandolese, 601 S.W.3d at 536 (quoting Saint Louis Univ., 321 S.W.3d at 292). Forster fails to demonstrate prejudice from the admission of the Phone Call on the basis that Forster's hostility towards police was inflammatory and outweighed any probative value. The record contains ample evidence of Forster's animus

toward police that was properly admitted during trial, including evidence offered by Forster through his expert witness, Dr. Zapf, which defense counsel explained was going to be addressed even prior to the admission of the Phone Call. See id. Dr. Zapf specifically testified about Forster's negative attitude and statements regarding police officers, evident from the "this sort of barrage of social media stuffed with all this [sic] antisocial attitudes that he has where he is saying F the police, and I don't care, and I want to take them out." Dr. Zapf testified that Forster experienced homicidal ideation associated specifically with police officers, which she opined was connected with his bipolar disorder. See id.; see also Tisius v. State, 183 S.W.3d 207, 218 (Mo. banc 2006) (noting the State's argument on whether remorse was relevant to whether the defendant deliberated was not improperly inflammatory where the defense raised the issue and the State was entitled to rebuttal argument). Further, although Forster disputes the Phone Call's relevance because it occurred nine months after the offenses were committed, Forster's defense relies on evidence obtained from the same time period of June 2017, as Dr. Zapf's testimony as to Forster's mental health was based in part on interviews conducted contemporaneously with statements made in the Phone Call. Additionally, copious evidence of Forster's social media posts in the months leading up to the incident were admitted, which depicted Forster's antipathy toward police, including statements such as "I want f--- the police carved into my grave[,]" "I feel bad for him, man, I hate the police so much[,]" and "Please help me if possible, man, I'll explain why if I have to, but I need Percocet, dude, like I'm legit about to go pull my .9 on a cop or some, I'm losing my f---ing mind, dude." A friend of Forster's also testified that Forster said he would "shoot a cop before" going to prison.

Because Forster cannot allege prejudice if the challenged evidence is cumulative to other related admissible evidence, we must find evidence of Forster's anti-police sentiments in the

Phone Call harmless beyond a reasonable doubt.  See Brandolese, 601 S.W.3d at 536 (internal citations omitted).  Accordingly, the trial court did not abuse its discretion in admitting the Phone Call into evidence.  See Stokes, 492 S.W.3d at 624–25 (citing Forrest, 183 S.W.3d at 223–24).  Point Four is denied.

Conclusion

The judgment of the trial court is affirmed.

KURT S. ODENWALD, Judge

Angela T. Quigless, P.J., concurs.
James M. Dowd, J., concurs.